808 So.2d 1148 (2000)
Jarrod TAYLOR
v.
State.
CR-97-2531.
Court of Criminal Appeals of Alabama.
February 4, 2000.
Rehearing Denied March 24, 2000.
*1159 Glenn L. Davidson, Mobile; and Richard D. Horne, Mobile, for appellant.
Bill Pryor, atty. gen., and J. Clayton Crenshaw, asst. atty. gen., for appellee.
*1160 COBB, Judge.
Jarrod Taylor appeals from his conviction of four counts of capital murder, see § 13A-5-40(a)(2) and (10), Ala.Code 1975. Taylor was tried before a jury on the charges that he intentionally murdered Sherry Gaston, Bruce Gaston, and Steve Dyas pursuant to one scheme or course of conduct and also murdered each of the victims during the commission of a first-degree robbery. Following a guilty verdict on each count, the jury recommended, by a 7-5 vote, that Taylor be sentenced to life imprisonment without parole. On August 25, 1998, the trial court overrode the jury's recommendation and sentenced Jarrod Taylor to death by electrocution. This appeal follows.
The State's evidence tends to show the following. On the morning of December 12, 1997, Jarrod Taylor and his friend, Kenyatta McMillan, took a .380 caliber pistol from the home of a friend of Taylor's and then bought a BB-pellet pistol from a nearby Wal-Mart discount department store. According to McMillan, who was the State's main witness against Taylor, Taylor was armed with the pistol and McMillan had the BB gun. Later that morning, the two men entered Steve Dyas Motors, a used car dealership in Mobile, for the purpose of robbing it. Jarrod Taylor pretended to be interested in purchasing a Ford Mustang automobile. Taylor negotiated the purchase of the automobile with Sherry Gaston, a salesperson at Steve Dyas Motors, and told her that he was from Louisiana and that his father-in-law was going to give him the money to purchase the automobile as an early Christmas present. Taylor and McMillan spent the day test-driving the automobile, filling out the paperwork for the purchase of the car, and waiting for Taylor's fictitious father-in-law to arrive with the $13,700 to purchase the car. At one point, Taylor asked Sherry Gaston for a bill of sale that he could take to his father-in-law to show him the price of the automobile. They came and went from the used car dealership several times during the day. As closing time neared, the employees of Steve Dyas Motors began leaving the dealership to prepare for their annual Christmas party. When Taylor and McMillan entered the car dealership for the last time, around dusk, only Sherry Gaston, who was awaiting Taylor's return to complete the sale, her husband, Bruce Gaston, and Steve Dyas, the owner, were in the office. When Taylor and McMillan entered the office, Taylor immediately shot Bruce Gaston in the chest with the .380 pistol. Bruce Gaston fell to the floor as Sherry Gaston ran to a bathroom and locked herself in and Steve Dyas ran to a back room and tried to escape through a window. Kenyatta McMillan stopped Steve Dyas and brought him back to the office at gunpoint. Taylor and McMillan were demanding to know where the money and the safe was, and Steve Dyas was on his knees begging for his life. Dyas tried to convince them that he did not have a safe and did not keep money in the office; he offered the two gunmen any car on the lot and the money and credit cards from his wallet. As Steve Dyas begged for his life, Taylor placed the .380 pistol to Dyas's head and shot him, killing him instantly. Taylor then went to the bathroom door and ordered Sherry Gaston to come out. Sherry Gaston obeyed and opened the bathroom door. She begged for her life and told them that she was the mother of two children who needed her; Taylor put the .380 pistol to her head and shot her, killing her instantly. The two gunmen then rummaged the office area, taking Sherry Gaston's purse and the wallets from the two male victims. They took the paperwork Sherry Gaston had prepared for the sale of the automobile, leaving copies *1161 of the paperwork on Sherry Gaston's desk that they thought would make it appear that Jarrod Taylor had bought the automobile. As they were preparing to leave, Taylor noticed Bruce Gaston move, so he walked over to Gaston's body, put the .380 pistol against Bruce Gaston's head and shot him, killing him instantly.[1] The two gunmen took the automobile they had been negotiating for and fled to Selma, where they were apprehended the next morning.

I.
Taylor argues that the trial court erred in prohibiting him from asking the State's forensic pathologist a question in cross-examination concerning the position of Steve Dyas's body when he was shot. Specifically, Taylor objects to the following sequence of events:
"Q [Defense counsel]: Now, Dr. Goodin, if you would, you said you went to the scene before the bodies had been moved. Given the [trajectory[2]] of this bullet and also the location of the entrance wound and location of the exit wound, did it appear to you that Mr. Dyas had been shot while his head was on the floor?"
(R. 1176.) The prosecutor objected to the question and the trial court cautioned defense counsel to determine the witness's qualifications to answer such a question. After defense counsel asked some questions, the trial court took over the questioning:
"THE COURT: That's not getting to it either. You have to get down to brass tacks. Dr. Goodin, have you had any training or experience in determining what position a person was in when that person was shot by figuring the [trajectory] of a bullet? Yea or nay?
"WITNESS: I can only determine the [trajectory] through the body. I cannot determine the position the body was in at the time the shot occurred."
(R. 1178.) After a few more questions, defense counsel then asked the court's permission to ask the witness whether she could state an opinion as to the position of Steve Dyas when he was shot, given the position of the entrance and exit wounds on the body and the absence of blood spatters on the wall beside the body. The judge responded:
"Well, that's not a predicate. That's a series of hypotheticals. By predicate, I mean her area of expertise. Number one, she hasn't professed expertise with regard to stating folks's positions when they have gotten shot. And no such expertise has been proved and she said she can't state that anyway. And classically, witnesses have been prevented from hazarding testimony on that topic. If you were to ask her all the questions you are asking her, basically you get her to invade the province of the jury. But we are not going to take 10 or 15 minutes trying to work out something where she can invade the province of the jury."
(R. 1183-84.) On appeal, Taylor argues that such testimony would not have invaded the province of the jury, because it was not being offered to prove an ultimate issue, but was merely evidence to impeach the testimony of Kenyatta McMillan.
The trial judge was correct in stating that expert witness testimony opining as to the position of the parties at the time of *1162 the shooting has historically been held to be inadmissible.
"`In a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. "This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound." Mathis v. State, 15 Ala.App. 245, 248, 73 So. 122, 124 (1916).'
"Ivey v. State, 369 So.2d 1276, 1280 (Ala. Cr.App.1979), writ denied, 369 So.2d 1281 (1979)(on rehearing)."
Lane v. State, 673 So.2d 825, 828-829 (Ala. Cr.App.1995).
However, we need not reach the question whether the expert opinion sought by Taylor reached the ultimate issue in this case. Rule 702, Ala.R.Evid., states:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Dr. Goodin, by her own testimony, was not qualified to give opinion testimony on the position of a body at the time it was shot. Therefore, such opinion testimony would have been beyond her expertise and would not have assisted the factfinder in determining any fact in issue, regardless of whether it was an ultimate issue or a peripheral one. The trial court did not err in denying Taylor's request to elicit opinion testimony from Dr. Goodin.

II.
Taylor argues that the trial court erred when, in denying Taylor's Batson[3] motion, it determined that he had not established a prima facie case showing that the prosecutor had used his peremptory strike in a racially discriminatory fashion. At the end of jury selection, Taylor made the following motion:
"MR. POWELL [Defense counsel]: Along the lines of what the court indicated earlier, in other words, having the displeasure of having to do thisthis motionalthough, according to the numbers it doesn't meet the predicate proof which would require the state to show race-neutral reasons. For the record, we would move pursuant to Batson v. Kentucky to eliminate those strikes that the state has made as being discriminating against this defendant on the basis of race. And for the record note that, of the 11 strikes, 8 of those strikesthe first 8 strikeswere of members of the black race and the remaining 2 or 3 strikes, rather, were all white females and the alternate strike was a white female. So the majority of the state's strikes were used to remove black persons from the venire, although, according to my count we have 5 members of the primary jury12 persons5 of whom are of the black race, which I believe would exceed, percentage wise, the initial number of percentage of blacks on the venire as a whole and the venire from which we struck. We ultimately exercised our peremptory strikes *1163 in this case. So, having said that, I don't know that we have made the predicate which would then shift the burden to them to do that because the numbers are fairly close. I believe 5 out of 12 would represent approximately 40 percent or 41 percent or 39 percent."
(R. 524-25.) The prosecutor stated that, contrary to defense counsel's assertions, the State's fourth strike was a white male, and that the State had used its peremptory strikes to remove seven black and five white veniremembers. The Defense counsel agreed. The court noted that all of the defense's strikes had been used to remove white veniremembers. The following then occurred:
"MR. CHERRY [prosecutor]: ... Art [Defense counsel] has not articulated any race-driven reason before the court to rise to the court's inquiry.
"MR. POWELL: I am not trying to argue with you. But I believe we have to make a predicate showing that representation of blacks on the jury that is selected underrepresents the total number of blacks that were on the venire. That is simply not the case. In fact, the black representation on the jury is more than the percentage of the total black memberspotential jury members when we started this and which we ultimately struck. Having said that, we can't make, according to my numbers, the predicate showing that would then shift the burden.
"THE COURT: I think both sides in this caseboth sets of counselare doing a splendid job; a splendid vigorous defense, splendid vigorous prosecution. I don't see a trace of racism in this case, and, therefore, I am overruling the Batson challenge.
"MR. POWELL: Thank you."
(R. 526-27.)
Given the fact that Defense counsel admitted four times that he did not believe he had presented a prima facie case of racial discrimination so as to shift the burden of proof to the prosecutor to require the prosecutor to offer race-neutral reasons for his peremptory strikes, we do not believe that the trial court erred in agreeing with defense counsel and denying the Batson motion. The fact that the prosecution used 7 of its 12 strikes against black veniremembers was not alone sufficient to require the prosecution to provide race-neutral reasons for its strikes. "Without more, we do not find that the number of strikes this prosecutor used to remove [blacks] from the venire is sufficient to establish a prima facie case of racial discrimination." Ex parte Trawick, 698 So.2d 162 (Ala.1997), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997). "We will not reverse a trial court's Batson ruling unless it is clearly erroneous. Great deference should be accorded a trial court's Batson ruling." Davis v. State, 718 So.2d 1148, 1158 (Ala.Cr.App. 1995) (citations omitted), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).
On appeal, Taylor advances two additional reasons for his claiming that the trial court erred in denying his Batson motion. Because these claims are raised for the first time on appeal, we review them for plain error only. Rule 45A, Ala. R.App.P. "For plain error to exist in the Batson context, the record must raise an inference that the state engaged in `purposeful discrimination' in the exercise of its peremptory challenges." Guthrie v. State, 616 So.2d 913, 914 (Ala.Cr.App.1992) (citing Ex parte Watkins, 509 So.2d 1074 (Ala. 1987)). While the absence of an objection in a case involving a death penalty does not preclude review of an issue, Taylor's failure to object does weigh against his *1164 claim of prejudice. Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990). We note that the record is silent on which veniremembers were black, white, or Hispanic. The parties did discuss their perceptions of the numbers of minorities on the venire (R. 522-23), but no one veniremember was specifically listed by race in the record, except for the one white veniremember identified by the State as being its fourth peremptory strike.
First, Taylor argues that, because the first eight peremptory strikes made by the prosecutor were in an ascending numerical order based on juror numbers, and because, Taylor says, that seven black veniremembers were struck during these first eight strikes, the prosecutor must have purposefully struck those persons because of their race. We do not agree. We do not see a sinister motive in what, on its face, is nothing more than an orderly striking process by the State, even assuming the State struck seven black veniremembers in its first eight strikes. This does not overcome the fact that, according to the numbers offered by the defense at trial, the prosecution struck only 7 of the 13 black jurors on the venire. Without more, we cannot say the order in which the State struck its jury raises an inference that the State engaged in purposeful discrimination. Ex parte Watkins, supra.
Taylor also argues that, because four of the black veniremembers who were struck were not asked any questions by the prosecutor in individual voir dire while the prosecutor asked many questions of the white jurors who were struck, there was disparate treatment of black and white veniremembers by the prosecutor. He argues this disparate treatment is evidence of purposeful discrimination by the prosecutor. This, however, is not disparate treatment. Disparate treatment would occur when all the jurors give similar answers to the same questions, yet one group is struck on the basis of that answer while another is not. See Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). Our review of the record reveals an extensive voir dire of the entire venire by both the prosecution and the defense. There is no indication of a lack of questioning or a lack of any meaningful questioning of any veniremember by the prosecution. Our review reveals no evidence of either disparate treatment or disparate examination of the members of the venire by the prosecution. Therefore, based on our plain-error review of the complete voir dire, we cannot say that a lack of individual questioning of some of the venire is, in this case, evidence of purposeful discrimination. Ex parte Branch, supra; Madison v. State, 718 So.2d 90, 102 (Ala.Cr.App.1997), aff'd, 718 So.2d 104 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998).

III.
Taylor argues that the trial court erred in admitting into evidence a document found in Taylor's possession at the time of his arrest that indicated he was $19,000 in arrears in child support payments. Taylor also argues that the trial court erred in allowing the prosecutor to refer to this document during his closing argument and that the trial court erred in not sua sponte giving the jury a limiting instruction concerning the document. Because there was never any objection at trial to the admissibility of the document and the argument of counsel concerning the document, and there was not a request by Taylor for a limiting instruction or an objection to the lack of such an instruction, we review this claim of error for plain error only. Rule 45A, Ala.R.App.P.
The record reflects that, during the State's case, the prosecutor introduced *1165 into evidence a blue bag found in Taylor's motel room after he was arrested in Selma. The blue bag, apparently with unidentified contents inside it, was admitted into evidence without objection. During the prosecutor's closing argument, the following argument was made:
"How would Jarrod Taylor know the workings of a car lot? Well, one of the pieces of evidence in this case [is] State's number 58, a blue bag. This bag was seized from the motel room, if you recall, up in Selma. In this bag is some business cards. The name `J. Taylor' on there; `Treadwell Honda.' You will see this when you get back to the jury room. Mr. Taylor, not only from these cards but from some records inside this bag here, worked at a car dealership at one point.
"That is very important, because having worked at a car dealership, don't you think this man knew when he fled from that scene that night which paperwork he thought he needed, if he had to answer questions to the police? Don't you think he knew what he might need?
". . . .
"Speaking of cash, $13,700, which he told the officers that he hadHe told these folks, `I had $13,700 cash that I had saved up.' Well, there was something else interesting in that blue bag. There was some other paperwork in there. Paperwork in the name of Jarrod Taylor which shows he was in arrears in his child support over $9000excuse me, over $19,000 in arrears in his child support. This is a man who is carrying his life in this bag here; his previous work; how much child support he owed. Ask yourselves, did this man have $13,700 in cash to pay for a car that night?"
(R. 1398-99.)

A.
On appeal, Taylor argues that the paperwork showing that he was in arrears in child support payments was improper evidence of collateral conduct and that it was improperly admitted for the sole purpose of prejudicing Mr. Taylor and influencing the jury to convict him solely because he had a bad character. He also argues that the trial court improperly allowed the prosecutor to refer to the document in closing argument.
Rule 404(b), Ala.R.Evid. states, in pertinent part:
"(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."
C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (5th ed.1996), states:
"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted.
"Rule 404(b) is a principle of limited admissibility. This means that the offered evidence is inadmissible for one broad, impermissible purpose, but is admissible for one or more other limited purposes....
"Use of the term `such as' makes it clear that the list of purposes, for which other crimes, wrongs or acts of the accused may be introduced, is not fixed or exhaustive. These proper purposes are *1166 limited only by such doctrines as materiality, relevancy, and unfair prejudice."
From the record, it is clear that the sole reason the child-support document was put before the jury during the prosecution's closing argument was to imply that because Taylor was deeply in debt, he would not have had $13,700 in cash to purchase the automobile from Steve Dyas Motors. That implication allowed the prosecutor to argue that 1) Taylor was lying to the sales staff at the car dealership, and 2) Taylor had a motive for the robbery/murder. Under the specific circumstances of this case, we find that the reference to a $19,000 child-support debt was directed at a material issue other than character, that it was relevant to the case, and that the probative value of the evidence to rebut the defense theory that Taylor had bought the automobile with a large amount of cash was not outweighed by unfair prejudice. Burgess v. State, 811 So.2d 557, 581 (Ala.Cr.App.1998), aff'd as to conviction, rev'd and remanded as to sentence, 811 So.2d 617 (Ala.2000). Taylor's failure to object to the evidence or the argument at trial also weighs against any claim of prejudice now made on appeal. Kuenzel v. State, supra. Therefore, we cannot say that the admission into evidence of the child support document or the prosecutor's argument in which he highlighted the $19,000 debt was plain error.

B.
Taylor also argues that the trial court erred in not sua sponte giving a limiting instruction on the proper use of evidence of collateral bad acts. Again, we review this issue for plain error only. Plain error is error that "has or probably has adversely affected a substantial right of the appellant," Rule 45A, Ala.R.App.P., or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).
Taylor has cited this court to several decisions by federal courts of appeals, which, he argues, stand for the proposition that the failure to give a sua sponte limiting instruction on the admissibility of evidence admitted under Rule 404(b) is plain error.[4] However, a review of those decisions reveals that the holdings in some were not what Taylor stated, and, in others, the courts found plain error based on the egregiousness of the particular set of facts in that case.
A limiting instruction by a trial court has the effect of lessening any prejudice that may have been caused by the evidence admitted under Rule 404(b); and Alabama courts have long urged judges to give such a limiting instruction when evidence of a collateral act or uncharged misconduct is admitted for a limited purpose. Malone v. State, 659 So.2d 1006, 1009 (Ala. Cr.App.1995). However, Rule 105, Ala. R.Evid., states, in pertinent part:
"When evidence which is admissible ... for one purpose but not admissible ... for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."
(Emphasis added.) In the present case, Taylor never requested a limiting instruction. Thus, we hold that the failure to provide a limiting instruction absent a request *1167 does not amount to plain error. See, State v. Bauer, 598 N.W.2d 352, 365 (Minn. 1999).
Moreover, even if the failure to give a limiting instruction in certain circumstances could constitute plain error, it does not do so in this case. Here, even without a limiting instruction, there were several factors reducing the 404(b) evidence's potential for unfair prejudice. The evidence itself was not a previous criminal conviction, nor was the collateral act in any way similar to the acts for which Taylor was being tried. Evidence of the child-support debt was placed before the jury only once, during closing argument, and the prosecution did not dwell on it for any length of time. Thus, based on our review of the record, we hold that the failure of the trial court to sua sponte give a limiting instruction on the proper use of the collateral act evidence was not plain error. Williams v. State, 710 So.2d 1276, 1292 (Ala.Cr.App.1996).

IV.
Taylor argues that the trial court made numerous errors in the sentencing phase of the trial that require a remand for a resentencing.

A.
Taylor argues that the trial court improperly considered recommendations for the death penalty by friends and family members of the victims which were offered as victim impact statements during sentencing and in the presentencing report. The record reflects that, during the sentencing hearing before the trial court, the prosecution presented two family members as victim-impact witnesses. Both witnesses, in testifying about the loss endured by their families, closed their statements by asking the trial judge to impose the death penalty. There were no objections to their statements. The prosecutor then introduced a packet of letters from other family members, stating, "I would ask simply that the court would consider those letters from ... the rest of the family. They are just too emotional to read those themselves this morning." (R. 1616.) Most of the letters recommended that the judge impose the death penalty. The judge accepted the packet of letters, without objection from Taylor. He also accepted the presentence report, which contained victim-impact evidence from one of the family members, along with her recommendation of the death penalty. Taylor now argues the trial court erred when it considered those recommendations in its decision to impose the death penalty. We review this argument for plain error only. Rule 45A, Ala.R.App.P.
Statements regarding the impact of the crime on the victim's family members are properly before a trial court at sentencing. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Therefore, the trial judge properly considered the victim-impact evidence before him at sentencing regarding the impact Taylor's acts had on the family members of the victims. However, the trial court could not consider that part of the victim-impact evidence regarding the characterization of the crime, the defendant, or the recommendations of an appropriate punishment. Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
The trial court, after accepting the letters from family members and ascertaining that there were no objections to the documents, stated, "Now, this is not evidence. Make it clear it is simply a bench hearing exhibit offered by the State." (R. 1618.) Then, before retiring to deliberate on the sentence, the trial judge commented, "I know that everybody *1168 wants this hearing to come to a conclusion. At the same time, I am going to follow the law to the letter and in the spirit." (R. 1632.) Just before pronouncing sentence, the trial judge stated, "The court has considered all materials appropriate for consideration...." (R. 1634.) Trial judges are presumed to know the law and to follow it in making their decisions. Ex parte Harrell, 470 So.2d 1309, 1318 (Ala. 1985); Sockwell v. State, 675 So.2d 4, 36 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). Our review of the record and the trial court's sentencing order leads us to conclude that there was no plain error. We find absolutely no evidence that the family members' sentence recommendations were considered by the trial court at sentencing. Burgess v. State, 723 So.2d 742, 765 (Ala.Cr.App. 1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).

B.
Taylor argues that the trial court improperly failed to consider mitigating evidence in its sentencing deliberations. Specifically, Taylor argues that the trial court erred when it failed to consider the more lenient sentence imposed on Kenyatta McMillan as a mitigating circumstance. Taylor also objects to the following sentence in the trial court's sentencing order: "Nothing in the evidence in this case or the demeanor of the defendant could reasonably be construed to warrant sparing the defendant's life under Alabama law as it is written." Taylor argues that "by finding that `nothing' supports a sentence of less than death at one point, and later indicating that the court is, in fact, considering some such circumstances as mitigating leaves this Court no rational sentence to review, and requires that this Court reverse." He also argues that by using the word "demeanor" in the above sentence, the trial court must have used courtroom demeanor as an aggravating circumstance, and thus improperly sentenced Taylor to death because of his courtroom appearance and his silence. These arguments have no merit.
Taylor confuses the trial court's obligation to consider all mitigating circumstances with the trial court's authority to afford those mitigating circumstances, if proven to exist, the weight they are due.
"Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer."
Carroll v. State, 599 So.2d 1253 (Ala.Cr. App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
From the trial judge's sentencing order, it is clear that the judge considered all mitigating circumstances proffered by Taylor. It is equally clear that the trial judge found that the nonstatutory mitigating circumstances were outweighed by the aggravating circumstances proved by the State.
The parsing of words from the sentence of that part of the trial judge's order weighing the mitigating circumstances does not create plain error where no error, plain or otherwise, exists. The sentencing order clearly indicates that the trial judge properly considered all statutory and nonstatutory mitigating circumstances found to exist. Even a cursory review of the trial judge's sentencing order clearly shows that the trial judge's use of the word "demeanor" in a single sentence does not refer to the courtroom demeanor of Taylor during trial and certainly does not imply that the trial judge used Taylor's *1169 appearance or silence at trial as an aggravating circumstance to sentence him to death. We find no error. Stewart v. State, 730 So.2d 1203, 1222 (Ala.Cr.App. 1996), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999).

C.
Taylor argues that the trial court's finding of the aggravating circumstance that the murders were "especially heinous, atrocious or cruel compared to other capital offenses" was in contravention of Alabama law. Specifically, he argues that the trial court improperly found the aggravating circumstance to exist because the killings were "deliberate and methodical." Taylor, citing Ex parte Clark, 728 So.2d 1126, 1140 (Ala.1998), argues that the Alabama Supreme Court has held that a deliberate and methodical slaying did not fall within this narrowly drawn aggravating circumstance. Taylor has taken words from the trial court's sentencing order out of context to make his argument. The findings of the trial court state:
"Further, the evidence proves that none of the victims offered any resistance whatsoever, two of them pleaded for their lives and offered Taylor and McMillan all of the victim's money and property available, and yet Taylor and McMillan deliberately and methodically murdered all three victims in the most certain way conceivable."
(C. 158.)
The Alabama appellate courts' interpretation of "especially heinous, atrocious, or cruel" has passed muster under the Eighth Amendment because those courts have consistently defined the term to include only "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Ex parte Clark, supra, citing, Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989). The Alabama appellate courts have considered the infliction of psychological torture as especially indicative that the offense was "especially heinous, atrocious or cruel." Thus, the mental suffering where a victim witnesses the murder of another and then realizes that soon he or she will also be killed, has been found to be sufficient to support a finding of this aggravating circumstance. Norris v. State, 793 So.2d 847, 854 (Ala.Cr.App.1999). As the trial judge pointed out in his sentencing order, two of the victims here witnessed Taylor kill another victim. Both tried to run and hide, but were captured. Both begged and pleaded for their lives; one offering money and property, the other pleading for the sake of her children. Both were deliberately and methodically executed with a gunshot to the head as they pleaded for their lives. These murders were not accomplished in a rapid-fire manner; there was sufficient time between the three murders for the next victim to be placed in significant fear for his or her life, and the evidence is clear that each was well aware of what was about to happen. Taylor's argument that the methodical nature of his acts exempts him from a finding that the murders were "especially heinous, atrocious, or cruel" is without merit. The trial court properly concluded that the murder of the three victims was "especially heinous, atrocious, or cruel." Ex parte Clark, supra.

D.
In its sentencing order, the trial court, in considering the jury's sentence recommendation of life imprisonment without parole, said:
"Constitutional and statutory law require that the trial court consider the sentence recommendation returned by the jury. In this case, five jurors voted for a sentence of death by electrocution *1170 and seven jurors voted for a sentence of life without parole. The sentence recommendation of a properly functioning jury is entitled to great respect. While the jurors in this case were cooperative, harmonious, diligent, and attentive, some jurors' outbursts of emotion after they found the defendant guilty of capital murder indicated that they were overwhelmed by their impending duty to consider the death penalty as required by law."
(C. 163-64.) The judge then finds that the aggravating circumstances outweighed the mitigating circumstances and declined to follow the recommendation of the jury.
Taylor argues that the above-quoted language was tantamount to a finding by the trial court that the jury was not functioning properly at the sentencing phase of trial and that this court must, therefore, reverse the sentence and return the case for a new sentencing phase before a properly functioning jury. Because there was no objection, we review this claim for plain error only. Rule 45A, Ala.R.App.P.
Our review of the trial court's sentencing order does not lead us to the same conclusion. We do not find that the trial court made a legal determination that the jury was not properly functioning during the sentencing phase of trial. Our plain-error review of the record reveals a properly functioning jury during sentencing. The language used by the trial court in its sentencing argument is nothing more than the court's weighing of and considering the jury's advisory verdict. Jackson v. State, [Ms. CR-97-2050, May 28, 1999], ___ So.2d ___, ___ (Ala.Cr.App.1999). This is not errorthe trial court, not the jury, is the sentencing authority. § 13A-5-47(e), Ala.Code 1975. This argument is without merit.

V.

A.
Taylor argues that the trial court erred in allowing the State to reopen its case, after both sides had rested but before closing arguments, in order to present rebuttal evidence. The record reflects that, during the defense's presentation of evidence, Brian Scott Clark, a prisoner in the same facility as Taylor and McMillan, testified that McMillan had admitted to him that he, and not Taylor, had killed the three victims and that McMillan wanted Clark to testify that Taylor had admitted to the killings. In the State's rebuttal, Clark recanted his testimony and testified that another defense witness, who had given similar testimony at trial, had told him that he was going to help Taylor.
Taylor argues that a trial court's discretion to allow a party to reopen its case is limited only to allowing a party to fill in an "omission" in the testimony of a witness. Thus, he argues, because the rebuttal testimony did not fill in an omission, but "strengthened" the State's case, it was error to allow the State to reopen its case to present it. We do not agree.
"This court has previously held that the trial court has great discretion in allowing the prosecution or the defense to present additional testimony, whether that evidence was omitted in the case-in-chief or on rebuttal, at any time before the case is submitted to the jury. § 15-14-4, Ala.Code 1975; Miller v. State, 518 So.2d 801 (Ala.Cr.App.1987); see also Nichols v. State, 276 Ala. 209, 160 So.2d 619 (1964) (prosecution allowed to reopen case to present testimony to rebut defendant's insanity plea where the defendant did not testify)."
Little v. State, 676 So.2d 959, 963 (Ala.Cr. App.1996).
*1171 The trial court did not abuse its discretion in allowing the State to reopen its case to present limited rebuttal evidence that a defense witness who had testified that the State's main witness had, himself, confessed to the killings, had recanted that testimony before the end of the trial.

B.
Taylor also argues that the trial court erred in denying his motion for a new trial after Clark retook the stand at the hearing on the motion and testified that his original trial testimony was the truth and that his recanted testimony was a lie; he testified that he had lied because he was threatened by the warden at the prison where he was incarcerated. Taylor argues that, had the jury heard Clark testify that his recantation was a lie, it would have returned a not guilty verdict.
The trial judge denied Taylor's motion for a new trial, stating that he found Clark's credibility, at trial and at the hearing on the motion for a new trial, to be extremely weak and that he found Clark's testimony conflicting and unbelievable. In reaching that conclusion, the trial judge took into account Clark's status as a convicted attempted murderer and Clark's gang affiliation. The warden, who also testified at the hearing on the motion for a new trial, denied Clark's allegations of coercion, and the trial judge resolved that conflicting testimony in favor of the warden. The trial judge, in denying the motion for a new trial, found the argument that another jury, upon hearing Clark's testimony, would reach a different conclusion was not well taken because of Clark's lack of credibility and because Clark's testimony was, for the most part, cumulative of that of the other prisoner, Robert Lee Nolin, whose testimony was before the jury even after the recantation. (R. 1710-16.)
"In order to grant a motion for a new trial [in death-penalty cases] alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; 3) that the movant is not relying on evidence of which he was aware at trial and which he consciously decided not to use to challenge the testimony of the perjured witness."
Ex parte Frazier, 562 So.2d 560, 570 (Ala. 1989).
The trial court's ruling on a motion for a new trial is presumed to be correct and will be upheld on appeal unless found to be clearly erroneous. Id. We agree with the trial court that there is not a significant chance that, had the jury heard Clark's latest recantation, it would have reached a different result. The jury had already heard both versions of Clark's testimony at trial and was in the best position to determine which version to believe. At best, his original testimony was cumulative with his fellow prisoner, Nolin, who also testified at trial. The trial court did not err in denying the motion for a new trial based on Clark's recantation. May v. State, 710 So.2d 1362, 1371 (Ala.Cr. App.1997).

VI.
Taylor argues that the trial court erred when it did not instruct the jury on the lesser-included offense of robbery. He argues that, because the jury was not given the option of convicting him of the underlying offense of robbery, the court never gave the jury the "rational option of convicting [him] of felony murder." He argues that, considering the defense's theory of the evidence, which placed the blame for the murders on Kenyatta *1172 McMillan, he was guilty, at most, of felony murder based on the underlying felony of robbery.
The record reflects that the trial court did give the jury the option of convicting Taylor of the lesser-included offenses of intentional murder and felony murder. Within the instructions for felony murder, the court defined the underlying offense as robbery, the elements of which had already been given to the jury. (R. 1473-79.) Because the jury was given adequate instructions that would have allowed it to return a verdict of felony murder based on the underlying offense of robbery, Taylor's argument that he was denied that option when the court did not specifically instruct the jury that it could also return a conviction for robbery is meritless. See Weaver v. State, 763 So.2d 972 (Ala.Cr.App.1998) (Double Jeopardy Clause prohibits prosecution and conviction for both felony murder and the enumerated felony).

VII.
Taylor argues that an emotionally unstable juror who, on the second day of trial, the trial judge excused and sent home, contaminated the jury by her actions and comments. Taylor argues that the trial judge erred in not conducting a more thorough voir dire examination of each jury member individually about his or her relationship with this juror or in not granting a mistrial and striking a new jury. Because Taylor raises this issue for the first time on appeal, we review it for plain error only. Rule 45A, Ala.R.App.P.
The record reflects that the jury in this case was sequestered and, before the trial resumed on the second day of the prosecution's case, the bailiff informed the trial judge as follows:
"[Juror H.D.] has been crying and up all night and complaining about everything. And she is really bothering a lot of the jurors with her complaining. And last night [Juror L.P.] came up to me and said that she said something along the lines of she would just hurry up and vote one way or the other just to get out of here faster. Then her roommate approached me with [Juror L.C.] and said that [H.D.] has been talking about the case and that she would just go ahead right now and vote guilty just so she could be able to go home.... Apparently she has never been away from her parents before. She is 23 years old and she still lives with them and she really just cries and complains to everybody about it. I think everyone has pretty much had it."
(R. 793-94.) The bailiff told the court that she had placed H.D. in a separate room and then went to all the other sequestered jurors and reminded them that they were not to talk about the case among themselves. The trial judge and counsel then questioned the three jurors who had complained about H.D.'s behavior. All three jurors confirmed that H.D. had been crying and complaining and had intimated she would vote guilty, or whatever it took, so that she could leave and go back home to her parents. All three jurors were questioned concerning how H.D.'s comments had affected them and all assured the court that they were not affected and could decide the case based solely on the law and the evidence before them. After the trial judge and counsel questioned H.D., the trial judge excused her, saying:
"Now then; even though this lady denies having made those statements, I don't believe her. I think she is emotionally unstable. I watched her start crying when I first put her in the jury box. I figured she might be worried about whether or not she would be able to get all of her things and how we would settle her in the hotel room. I *1173 didn't realize she would be unstable throughout the trial. She looks like one of the more unstable people I have seen. She sits squirming around in the back row of the jury box, smirking part of the time and looking distracted the rest of the time, and sniveling some of the time. Does anybody have any objection to my discharging her from this jury?"
(R. 811-12.) Hearing no objections, the judge discharged Juror H.D. The prosecutor then asked the judge whether he should ask every juror whether they had been affected by the juror's conduct. The trial judge agreed and brought the entire jury back into the courtroom. He then questioned the jurors as a group:
THE COURT: "Now, ladies and gentlemen of the jury, [H.D.] will no longer be serving with you. I have discharged her from the jury. I need to ask all of you a question that I have already asked some of you. I gather that [H.D.] has been saying peculiar things about her views on the case and so forth. But whatever she has been doingand I am not going to limit my question to the things that I am aware of [that] she has been doing. But, rather, I am going to ask all of youand I will just go through one by one and ask you each to answer individually I am going to ask all of you whether anything that [H.D.] has done or said would cause any of you any difficulty in giving both sides an absolutely fair trial in this case or whether anything she has done or said would keep any of you from deciding this case solely on the basis of the law and the evidence. I will first ask you, [Juror P.].
"JUROR P.: I haven't really said anything to her.
"THE COURT: Has anything she has done or said or would anything she has done or said cause you any difficulty in giving both sides a fair trial?
"JUROR P.: No.
"THE COURT: Would anything she has done or said keep you from deciding this case solely on the basis of the law and the evidence?
"JUROR P.: No."
(R. 813-14.) The trial judge then asked the same questions of each juror. Each responded negatively. Then the trial judge cautioned the jury not to talk among themselves about any aspect of the trial, no matter how trivial or seemingly unimportant. He reminded them to wait until their closed deliberations before they entertained any discussion of the trial. Then, when neither side objected to the judge's questions or instructions, the prosecution proceeded with its witness presentation.
"Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion." Gaffney v. State, 342 So.2d 403, 404 (Ala.Cr.App. 1976), cert. denied, 342 So.2d 404 (Ala. 1977).
"`In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion "where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark." Bascom v. State, 344 So.2d 218, 222 (Ala.Cr.App. 1977). However, the trial judge has a duty to conduct a "reasonable investigation of irregularities claimed to have been committed" before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Cr.App.1984). His investigation should include a "painstaking and careful" inquiry into the alleged juror misconduct. Lauderdale *1174 v. State, 22 Ala.App. 52, 54, 112 So. 92, 93 (1927).
"`. . . .
"`... [W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark by a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.
"`. . . .
"Ex parte Lasley, 505 So.2d 1263, 1264 (Ala.1987)."
Riddle v. State, 661 So.2d 274, 276 (Ala.Cr. App.1994), quoting Holland v. State, 588 So.2d 543, 546, 548-49 (Ala.Cr.App.1991).
"What constitutes a `reasonable investigation of irregularities claimed to have been committed' will necessarily differ in each case. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.
"`. . . .
"... As long as the court makes an inquiry that is reasonable under the circumstances, an appellate court should not reverse simply because it might have conducted a different or a more extensive inquiry. Generally, where the judge polls the jury and each juror indicates that there has been no improper communication, that is sufficient. See Ham v. State, 540 So.2d 805, 810 (Ala. Cr.App.1988); Ex parte Weeks, 456 So.2d 404, 407 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). There is no absolute requirement that a juror alleged to have received an improper communication be examined apart from the other jurors. See Smith v. State, 432 So.2d 550 (Ala.Cr.App.1983), and Hopkins v. State, 429 So.2d 1146, 1152 (Ala.Cr.App.1983)(wherein the jury was questioned together as a group)."
Sistrunk v. State, 596 So.2d 644, 648-49 (Ala.Cr.App.1992).
In this case, the trial court individually questioned H.D., and each juror who had reported the behavior of H.D. After a thorough investigation, the trial court determined that the remaining jurors had not been influenced by her remarks. The court quickly removed Juror H.D. from the jury and sent her home. There is absolutely no indication in the record that the other jurors were tainted by H.D.'s behavior or by her comments regarding the case. Nor is there any indication that the jurors were not truthful or forthcoming to the trial court, when asked if they would be influenced by H.D.'s comments and whether they could fairly try the case. In fact, the court's investigation revealed that the jurors who had reported H.D.'s behavior were very serious about following the court's directives. We do not find error, much less plain error, in the trial court's examining the jury as a group. Under these circumstances, there was no need for the trial court to sua sponte declare a mistrial and restrike a jury because of the behavior of Juror H.D.

VIII.
Taylor next argues that the testimony of his accomplice Kenyatta McMillan was uncorroborated and was, therefore, insufficient to support a capital murder conviction. Specifically, Taylor argues that, while there was sufficient evidence to indicate that he "may have been involved in the robbery of [Steve] Dyas Motors," there was "no evidence to corroborate McMillan's *1175 claim that it was Taylor who shot and killed anyone."
Section 12-21-222, Ala.Code 1975, provides:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
This court has stated:
"`"The test for determining the sufficiency of the corroborative evidence of the testimony of an accomplice is through a `subtraction process.' The test is generally stated:
"`"`First, the evidence of the accomplice must be eliminated, and then, if upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration.'"
"`McCoy v. State, 397 So.2d [577] at 585 [(Ala.Cr.App.), cert. denied, 397 So.2d 589 (Ala.1981).] (citations omitted, emphasis in original).
"`"[C]orroborative evidence need not refer to any statement or fact testified to by the accomplice. Neither must it be strong nor sufficient of itself to support a conviction. The probative value of the evidence need only legitimately tend to connect the accused with the crime and need not directly do so. Further, corroborative evidence need not directly confirm any particular fact nor affirm each and every material fact testified to by the accomplice. Corroboration may be proven by circumstantial evidence alone."
"`Mills v. State, 408 So.2d [187] at 191 [(Ala.Cr.App.1981).]
"`. . . .'
"Section 12-21-222, `[d]oes not require corroborative testimony as to material elements of the crime....' Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985), but, the corroborative evidence must `tend to connect the defendant with the commission of the crime.' § 12-21-222, Code of Alabama 1975."
Chevere v. State, 607 So.2d 361, 365 (Ala. Cr.App.1992).
The trial court made the following findings regarding the corroboration of Kenyatta McMillan's testimony:
"Overwhelming evidence corroborates McMillan's testimony against defendant Taylor. The items of corroboration are too numerous to recite in this order, but the following items of corroboration are typical examples:
"1. An independent witness testified to Taylor's participation in stealing the murder weapon before the crimes;
"2. Independent witnesses testified that they saw the defendant and accomplice McMillan at Steve Dyas Motors at various times during the day of the murder performing various aspects of their false negotiations for defendant Taylor to buy the Ford Mustang from Steve Dyas Motors;
"3. An independent witness testified to defendant Taylor's participation in disposing of the murder weapon after the crimes;
"4. Independent witnesses testified that defendant Taylor was driving the Ford Mustang in Mobile within an hour or so after the crimes and in Selma the next day when and where Taylor and McMillan were captured;

*1176 "5. Defendant Taylor's own statement to the police detailed his participation in the pretense of negotiating for the purchase of the car and contained statements proven by other evidence to be false.
"Discounting entirely the testimony of accomplice McMillan, the corroborating evidence, together with the forensic evidence, introduced at trial was and is sufficient to support the capital murder convictions and would be superabundantly sufficient to support non-capital murder convictions against Taylor. A fortiori, the corroborative evidence fulfills the test of `tending to connect the defendant with the commission of the offense ...,' as required by Section 12-21-222 of the Code of Alabama, 1975."
(C. 156-57.)
We agree. The evidence clearly proved Taylor's proximity, chronologically and geographically, to the murders; that evidence, when combined with the other independent evidence connecting him to the murder weapon and the stolen automobile, was sufficient corroborative evidence to present the case to the jury. Glasco v. State, 513 So.2d 54, 57 (Ala.Cr.App.), cert. denied, 513 So.2d 61 (Ala.1987); C. Gamble, McElroy's Alabama Evidence, § 300.01(14) (5th ed.1996).

IX.
Taylor argues that the trial judge erred in limiting his opening statement to the jury. Specifically, Taylor had wanted to inform the jury that Kenyatta McMillan had made inconsistent statements to police investigators concerning his involvement in three prior robberies. The prosecution objected, arguing that introducing these prior bad acts of the State's witness prior to that witness's testifying was improper. In sustaining the prosecutor's objection the trial judge noted:
"I am inclined to think, [defense counsel], if your principal point is that the statements were inconsistent or grossly inconsistent, then at this point the thing to do is just say that in a conclusory way. I intendI tend to agree with the State to throw in at this point without any assurance that it will ever come into evidence that the co-defendant or accomplice is a serial robber is probably a pretty heavy load and shouldn't be done. So I think you can argue inconsistency but not put in the collateral acts at this point. What you are trying to say is that he is a liar, basically, aren't you?
". . . .
"It is a little bit early for me to deal with the collateral acts thing. So I think I will stick with the ruling. We can certainly, if those collateral acts become material there will be plenty of ways for the defense to emphasize it. All right. Bring in the jury."
(R. 608-09.)
The trial judge was correct. The purpose of an opening statement is merely to advise a jury of the issues in a case and to allow each party to give the jury an overview of what the evidence will show. Braswell v. State, 371 So.2d 992, 995 (Ala.Cr.App.1979); McKinney v. State, 654 So.2d 95, 98 (Ala.Cr.App.1995). "It is well established that the scope and extent of counsel's opening statement to the jury in a criminal case are matters in the sound discretion of the trial judge and his ruling will not be overturned unless an abuse of discretion is shown." Frazier v. State, 366 So.2d 360, 365 (Ala.Cr.App.1978).
In his opening statement, Taylor wanted to attack McMillan's credibility with collateral acts and inconsistent statements concerning prior robberies. The credibility of a witness, however, is not at issue until the witness actually takes the *1177 stand to testify. Thus, the trial judge correctly limited Taylor's opening statement to a general statement concerning inconsistencies in his statements to police investigators. See Shelton v. State, [Ms. CR-97-1313, May 28, 1999], ___ So.2d ___ (Ala.Cr.App.1999). There was no abuse of discretion by the trial judge.

X.
Taylor next argues that he was denied his right to due process when he and his counsel were not present during a portion of jury selection. He bases his argument on the following comment by the trial judge at the start of the trial: "You all have probably talked with the judge who empaneled you about all this before. This is not an opportunity to take a second crack at the judge.[5]" (R. 213.) Because Taylor did not present this claim to the trial court, we review it for plain error only. Rule 45A, Ala.R.App.P.
This argument has been decided adversely to Taylor in Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999). In that decision, this court stated:
"The appellant also argues that he had a right to be present when [another trial judge] organized the jurors for the week. Rule 9.1(a), Ala.R.Crim.P., provides that a defendant has the right to be present `at arraignment and at every stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict, and sentencing.' It does not include the general organizational meeting of the potential jurors for the week."
Maples at 50. There is absolutely no indication in the record that another trial judge had any part in the selection of the jury in this case. We will not predicate error on matters not shown by the record, nor can we presume error on a silent record. Smelcher v. State, 520 So.2d 229 (Ala.Cr.App.1987).
However, even if another trial judge had excused some veniremembers during the organizational session with the venire, it would not be error. The current statute specifically states that a defendant does not have the right to be present when potential jurors are excused. Section 12-16-74, Ala.Code 1975. "`A judge in a capital case may excuse members of the venire outside the presence of the defendant and his counsel....'" McWhorter v. State, 781 So.2d 257 (Ala.Cr.App.1999), quoting Ex parte Pierce, 612 So.2d 516, 519 (Ala.1992).

XI.
Taylor argues that he was deprived of his constitutional right to due process when the trial court appointed additional counsel to represent him and "refused to allow the newly appointed counsel to seek a continuance" as a condition of appointment. Because Taylor never raised this concern with the trial court, we review it for plain error only. Rule 45A, Ala.R.App.P.
The record reflects that Taylor was represented by retained counsel. On July 27, 1998, approximately a week before the trial was scheduled to start, Taylor filed a motion for the appointment of additional counsel. During a hearing on the motion *1178 conducted the next day, the following occurred:
"THE COURT: [M]y initial take on the motion, subject to positions to be expressed by both sides, but my initial impression is that inasmuch as the State will probably have a couple of lawyers at trial, there would be some equity in having the defendant have a couple of lawyers at the trial as well and a couple of lawyers working on the preparation of the case between now and the trial date. But the point on which I want to be entirely satisfied is that the adding of counsel will not delay the trial. I will need for you to tell me what your situation is, Art [additional defense counsel], with regard to that. Are you in a position at this time to undertake this appointment and to go to trial on schedule? This case is scheduled for August 3, I believe, isn't it?
"[Prosecutor]: Yes, sir.
"THE COURT: August 3. And today is July 28. So there are just a few days between now and the trial date. Are you in a position to undertake the appointment and go to trial on the 3rd without putting the court in a position of having to entertain a motion to continue that you would possibly file on the ground of not being ready or your recent appointment or whatever?
"MR. POWELL: Judge, I accepted Richard [retained counsel] contacted me last Friday and asked me if I would accept an appointment to help him in this case. I contacted him on Sunday after checking my schedule. Fortunately, the first week of August, traditionally, and particularly this time for me is not very busy and I haveI accepted his offer or request, agreed to do this with the understanding that my accepting it would not work to create any kind of a delay in the trial. In all honesty, Judge, I have been working on this case since I met with Richard on Sunday, this past Sunday. So my appointment by the court will not in and of itself cause any sort of delay in the trial. I would ask that Your Honor, if you are inclined to appoint me, that you make that appointment effective last Friday to account for my efforts with Richard since that time.
"Well, that would be fair enough. Thisthe pendency of this motion has been no secret. I have talked with both Richard and [the prosecutor] about it and have told them that I would be favorably disposed toward the motion. And, therefore, Art, you had every reason to expect that if the granting of the motion would not work a continuance or delay of the trial, that you would be appointed pursuant to the motion. I recognize that and I am happy to make your appointment retroactive.
". . . .
"THE COURT: Mr. Taylor, what do you think about all of it? Are you in complete agreement?
"THE DEFENDANT: My lawyer is fine with it. I am fine with it.
"THE COURT: All right. And you agree to the addition of Mr. Powell at this time and you are not going to be trying to delay the trial on account of his coming into the case?
". . . .
"THE DEFENDANT: No, sir; I am not going to try to delay it.
"THE COURT: And, `yes, sir,' you do agree?
"THE DEFENDANT: Yes, sir."
(R. 54-56.)
Taylor's argument that, somehow, the trial court violated his due process rights by granting him exactly what he requested is not supported by the record. The record *1179 reflects that the trial court was justifiably concerned with another delay in the trial by appointing additional counsel so close to the scheduled trial date. There is nothing in the record to indicate that the trial court conditioned the appointment of counsel on any ground, or that the court refused to allow Taylor to seek a continuance. All the parties assured the trial judge that the appointment of additional counsel at such a late date was not a ploy to seek a continuance of the trial. There is no indication in the record that Taylor and his counsel were not fully prepared to begin trial on the scheduled trial date. This argument is without merit. See Smelcher v. State, 520 So.2d 229 (Ala.Cr. App.1987).

XII.
Taylor argues that, because of the number of police officers who responded to his arrest, he was placed under such pressure that he was not given a fair opportunity to invoke his Miranda[6] rights and that, therefore, the trial court erred in denying his motion to suppress a statement he made to the officers. We note that, although Taylor made a general motion to suppress his statement prior to trial, when asked exactly what his objection was to the admission of the statement, defense counsel responded:
"I think we need to affirmatively show on the record what, if anything, was said during those conversations as they might reflect upon the waiver and, of course, would affect the content of the statement itself.... In order to find out whether it is a valid waiver I certainly need to know what was said in any preliminary conversations."
(R. 544-45.) Because Taylor makes a different argument on appeal than he made before the trial court, we review this issue for plain error. Rule 45A, Ala.R.App.P.
"`Extrajudicial confessions are prima facie involuntary and inadmissible, and the burden is upon the state to show voluntariness and a Miranda predicate in order for them to be admissible.' Mitchell v. State, 706 So.2d 787, 801 (Ala.Cr.App. 1997) (citations omitted).
"`The general rule is that for a confession to be admissible the state must show that the defendant was advised of his rights, as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, and that the defendant gave the statement after making a voluntary and knowing waiver of those rights.'
"Robinson v. State, 698 So.2d 1160, 1162 (Ala.Cr.App.1996), cert. denied, 698 So.2d 1165 (Ala.1997) (citations omitted). `"Whether a waiver is voluntary, knowingly, and intelligently made depends upon the particular underlying facts and circumstances of each case, including the background, experience, and conduct of the accused."' Langley v. State, 641 So.2d 339, 340 (Ala.Cr.App.1994) (citations omitted).
"`"`"(1) The test for voluntariness involves a consideration of the totality of the circumstances. (2) `The admissibility of confessions is for the court, their credibility is for the jury.' (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. `(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' (4) This finding will not be disturbed on appeal unless the appellate court is convinced that *1180 the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. `Review of the court's action is limited to determining whether its finding was clearly erroneous.'"'"'
"Fox v. State, 659 So.2d 210, 214-15 (Ala.Cr.App.1994) (citations omitted), quoting Whittle v. State, 518 So.2d 793, 796 (Ala.Cr.App.1987)."
Farrior v. State, 728 So.2d 691, 699 (Ala. Cr.App.1998) (some citations omitted).
At a hearing on the motion to suppress, Mobile police officer Linda Tims testified that only she and fellow officer Donald Pears were with Taylor in an interrogation room at the Selma Police Department when he was advised of his Miranda rights. According to her testimony, Taylor had been in a holding cell since his arrest earlier that day. The only other officers to have visited Taylor were two other Mobile officers who earlier had asked Taylor for his consent to allow them to search his car and motel room. The evidence indicated that, when Taylor was advised of his Miranda rights, he did not appear to be intoxicated, he appeared to understand and participate in the conversation, he was coherent, and he was not threatened, coerced, or induced to make the statement by promises of leniency. According to Officer Tims, Taylor acknowledged his rights, stated that he understood them, and did not request an attorney.
There is no evidence in the record to support Taylor's argument on appeal that his will was overborne by the sheer number of police officers who were present at the time he was arrested. There is no evidence that Taylor felt threatened with physical intimidation or psychological pressure because of police action. McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998). An examination of the totality of the circumstances in this case supports the trial court's determination that Taylor made his statement voluntarily. Thus, the trial court did not abuse its discretion in admitting Taylor's statement into evidence.

XIII.
Taylor argues that the trial court erred in allowing the jury to hear a audiotape of his statement which, because the trial court had granted the defense's request to redact a portion of the statement that referred to uncharged misconduct, the prosecution had to stop and fast-forward beyond the redacted portion of the tape. Taylor objects to the obvious gap in the tape and also to the trial court's instruction, which informed the jury that it would not be hearing a portion of the tape. He argues that this procedure improperly allowed the jury to draw adverse inferences from the gap, which could have been avoided had the court required the prosecutor to make a new tape. Because Taylor did not object to this procedure at trial, we review this issue for plain error only. Rule 45A, Ala.R.App.P.
The record reflects that defense counsel asked the trial court to redact that portion of Taylor's statement that referred to his having been in prison and in a halfway house. Counsel specifically asked for that comment to "either be redacted or not read to the jury or otherwise left out." (R. 578.) The parties discussed skipping forward over that part of the tape, and were concerned only about making sure the jury did not hear that part, should the tape go to the jury room during deliberations. *1181 When the tape was played for the jury, the prosecutor stopped the tape and began to fast-forward to a point beyond the redacted portion. As the prosecutor was doing that, the trial judge instructed the jury:
"Now, ladies and gentlemen, they are skipping material that does not pertain to this case and both sides have agreed and you should disregard the fact of the skipping and simply consider whatever is presented to you together with any other evidence or lack of evidence in the case."
(R. 1092.)
We agree with Taylor that, under certain circumstances, an obvious gap in the middle of a defendant's statement could allow a jury to draw adverse conclusions, even though it never heard the actual words spoken. See Gray v. Maryland, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998).[7] However, this is not such a case. We note that the trial judge instructed the jury that the skipped portion of the statement was irrelevant and instructed it to disregard the skipping process. The court also instructed the jury to consider only the evidence or lack of evidence properly before it. In reviewing the statement and the redaction, there is no likelihood that, given the court's instructions, the jury could have reached an adverse conclusion or guessed what the missing portion contained based on the gap in the tape. "Because the trial court's statements, when viewed under the facts of this case, were not such as to influence the result of the case, they did not constitute plain error." Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999).

XIV.
Taylor argues that the trial judge erred in not sua sponte excusing veniremember E.P. after he stated that he recognized Kenyatta McMillan from school, that he recognized a relative of one of the victims from seeing her at parties, and that he had heard details of the murders recounted in the media. Because Taylor never challenged veniremember E.P. for cause, or objected to his not being removed for cause, we review this issue for plain error only. Rule 45A, Ala.R.App.P.
When asked to recall what he remembered hearing about the incident at Steve Dyas Motors through the media, E.P. responded:
"E.P.: I remember it sayingit might have been on [television], but I think it was in the newspaper about them kicking in doors. I don't remember exactly which victim it was [who] was trying to hide behind a locked door and the door was kicked in or shot in and she was shot. That is about all I remember.
"THE COURT: Do you recall any report on how the people were shot?
"E.P.: Execution-style.
"THE COURT: Did you read or see any reports on the apprehension of any suspects?
"E.P.: Yes, sir. I did. Something about, I think, they might have taken a car. I think they were from Selma. Something that had to do with Selma in it.
"THE COURT: Do you recall any report of anything that would seem to connect the suspects with the crime?
"E.P.: No, sir.

*1182 "THE COURT: From the news media reports have you formed any opinion or begun to form any opinion to the effect that any person is innocent or guilty of this offense?
"E.P.: No, sir. I didn't follow it that close.
"THE COURT: Have you begun to form any opinion to the effect that the authorities do or do not have the right person?
"E.P.: Yes. It seems they have the right person, according to some of the media I have heard.
"THE COURT: What I mean is, is that your impression of simply what the media says, or is that an opinion that you are beginning to hold yourself?
"E.P.: No, sir. That is media. That is not my personal opinion.
". . . .
"THE COURT: If you are selected to serve on this jury, can you completely disregard those stories in the news media and your impressions from those stories in the news media and your acquaintance with Kenyatta McMillan and your acquaintance with Ms. Dyas and decide the case solely on the basis of the evidence and the law presented to you in this courtroom during the trial?
"E.P.: Yes, sir."
(R. 417-18.) Neither the prosecutor nor the defense counsel asked any follow-up questions of E.P., and neither side challenged E.P. for cause.
The trial court is vested with considerable discretion in determining whether a prospective juror's demeanor and answers to voir dire questions indicate that the juror should be disqualified, and the court's decision on that issue is entitled to deference. Roberts v. State, 735 So.2d 1244, 1260 (Ala.Cr.App.1998). There is nothing in the record that indicates that veniremember E.P. might not have been impartial or that he would not have followed the trial court's instructions. We find no plain error, either on statutory or common-law grounds, in the trial court's failure to sua sponte remove E.P. from the venire. Williams v. State, 710 So.2d 1276, 1323 (Ala.Cr.App.1996).

XV.
Taylor argues that the following errors prevented him from having an impartial and unbiased jury:

A.
Taylor argues that the trial court improperly denied his motion that veniremembers be required to complete a jury questionnaire. However, a review of the record indicates that the trial court granted Taylor's motion for a questionnaire, after the court and the counsel tailored the questionnaire proposed by defense counsel. (R. 75-83.) It is readily apparent from the record that a questionnaire was prepared by Taylor, handed out to the venire, was completed by the potential jurors, and handed in at their first session with the court. (R. 108-11.) Taylor specifically agreed he was satisfied with the degree of answers he received on the questionnaires. (R. 111.) This argument is without merit.

B.
Taylor next argues that the trial judge improperly denied his motion for individual voir dire examination. Taylor argues that, because he was required to examine the veniremembers in a group setting, the entire venire was contaminated by hearing about an unrelated prior bad act when a veniremember stated that he knew Taylor because "he has pawned and sold me some jewelry at my place of work." (R. 150.) Taylor also argues that the venire was contaminated when it was *1183 made aware of "inadmissible good character evidence of one of the victims" after a veniremember related that he "had church affiliations" with one of the victims. (R. 158.)
The record reflects that, on July 28, 1998, during a pretrial session, defense counsel informed the court that he would be filing motions concerning the qualification of jurors. In response, the trial court informed counsel as to how the court intended to conduct voir dire:
"With regard to the way we are going to select the jury, it is going to be a hybrid sort of thing. I know that you may have to file all these motions asking that every juror be questioned absolutely privately from every other and all this sort of stuff. As a practical matter, I am not going to do that. As a practical matter, what I am going to do is I am going to ask the entire panel my general series of relatively innocuous questions about who they know and who they are related to and various prejudices they may have and so forth. And then when I start delving into knowledge about this particular case, then essentially I will get initial answers, `yea' or `nay,' whether the jurorswhether a particular juror thinks he or she has knowledge of the particular case. Once I isolate some juror who thinks he or she has knowledge of the particular case, then I would ask that juror outside the presence of the other panel members about that knowledge or his or her thought that she has that knowledge. With regard to pretrial publicity, as a general rule, I will ask the jurors to restrict their answers to `yea' or `nay' until I get to a point where I think I have to delve into the juror's response. Sometimesfor instance, I will ask the entire panel whether any of them think that they have seen radio, television, or new reports on this case, and a certain number will raise their hands. Then I will go through those with raised hands and I will ask whether any of them have, from those particular articles, formed any opinion as to the guilt or innocence of any person or as to the particular facts of the case. And for the ones that say, `No, I have formed no opinion as to guilt or innocence of any person,' or who have, in effect, answered that as far as to any of the particulars of the case, that probably wouldn't require much further inquiry. If somebody says, `Well, yes, I think I have formed an opinion as to guilty or innocence or some particulars,' then, there again, obviously we would have somebody who would need to be questioned outside the presence of the other panel members. That is sort of a brief review of the way I generally handle it. It has worked pretty well."
(R. 70-71.) In response to that overview of how the trial court planned to conduct its voir dire, defense counsel responded:
"Judge, and again, the motion that I file basically is going to ask, you know, either you or the attorneys be allowed to do it basically the way you just told us. And that is, we would ask for individual voir dire, if there is a response to certain questions that separate that individual from the bulk of the venire. So we don't have a problem with that."
(R. 71-72.) Defense counsel then asked the judge if he was going to conduct voir dire examination based on questions submitted by counsel. The trial judge responded, "Not really. What I will do is conduct what I think of as standard voir dire that applies to virtually every criminal case, plus, I suppose, some death-penalty-qualification questions, and then turn the questioning over to the lawyers. You all will certainly be allowed to ask your own questions with some latitude." (R. 72.) *1184 There was no objection to the trial court's proposals. The next day, Taylor filed a motion entitled "Requested Voir Dire," which contained six pages of proposed voir dire questions. In that motion, Taylor also wrote, "Defendant further requests that these questions be asked to the jurors individually, or in panels of three or less." (C. 65.) The trial court never ruled on this portion of Taylor's motion, nor did Taylor ever renew this motion in an effort to obtain a ruling. Taylor never objected to the trial court's system of conducting voir dire, or to the questioning of any individual veniremember in a group setting. We therefore review this issue for plain error only. Rule 45A, Ala.R.App.P.
"`Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination.'"
Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App.1990).
In a capital case, the conduct of the voir dire examination of the jury venire is a matter within the discretion of the trial court. Bell v. State, 475 So.2d 601 (Ala.Cr.App.1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). The trial judge did not deny Taylor the opportunity to conduct individual voir dire, but merely noted a preference that general questions be asked of the venire as a whole in order to establish the necessity for individual questioning. Both sides agreed with the proposed voir dire procedure. Taylor's reference to two examples of "jury contamination" caused by the judge's method of voir dire is specious. The fact that Taylor may have pawned and sold jewelry to a member of the venire is not evidence of collateral bad acts, nor is the fact that a veniremember had a "church affiliation" with one of the victims inadmissible evidence of the good character of that victim. Rule 404(a) and (b), Ala.R.Evid.[8] Taylor has failed to demonstrate any possible prejudice caused him by the trial judge's voir dire procedure.

C.
Taylor argues that the trial court erred when it denied his pretrial motion to disqualify "all potential jurors who were acquainted with either the victims or who know any of the victim's immediate family members." Taylor argues that because these persons would have known the deceased's standing and reputation in the community and because they would be tainted by the grief of family members, they should have been automatically disqualified.
"`[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury.' Brownlee v. State, 545 So.2d 151, 164 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).... Instead, the test is `whether the [prospective] juror's acquaintance with [the victim] or relative is such that it would result in probable prejudice.' Vaughn v. Griffith, 565 So.2d 75, 77 (Ala.1990), cert. denied, 498 *1185 U.S. 1097, 111 S.Ct. 987, 112 L.Ed.2d 1072 (1991)."
Morrison v. State, 601 So.2d 165, 168 (Ala. Cr.App.1992) (citations omitted). Because a veniremember's mere acquaintance with a victim or a family member of a victim is not sufficient to justify a strike for cause, the trial judge did not err when it denied Taylor's motion. There is no error here.

D.
Taylor lastly argues that the trial court repeatedly intimidated and harassed the jurors and interfered in his voir dire questioning so as to prevent him from properly exercising his challenges for cause. While Taylor is vague as to exactly what actions by the trial court he objects to for the first time on appeal, he does refer us to several pages in the transcript. We review this issue for plain error only. Rule 45A, Ala.R.App.P.
"At the outset, we note that the trial court has discretion in conducting voir dire examination of the jury venire and a trial court's decision in exercising that discretion will not be overturned without a showing of abuse of that discretion. See Browning v. State, 549 So.2d 548 (Ala.Cr.App.1989)."
Lane v. State, 644 So.2d 1318, 1322 (Ala. Cr.App.1994).
We have reviewed the entire voir dire and find Taylor's argument to be without merit. On the pages of the record referenced by Taylor, we find that the trial judge was only inquiring about veniremembers' knowledge of or bias in the case, or was attempting to clarify answers given by a veniremember. These actions by the trial judge were not harassing or intimidating, nor did they interfere with Taylor's ability to conduct a voir dire examination. There is no error, plain or otherwise, here. Travis v. State, 776 So.2d 819 (Ala.Cr.App. 1997).

XVI.
Taylor next argues that several instances of alleged prosecutorial misconduct denied him a fair trial. We will discuss these allegations of misconduct separately.
"This court has stated that `[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). `In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). `A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' Roberts v. State, [735 So.2d 1244 (Ala.Cr.App.1997) ], aff'd, [735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999) ]. Moreover, `statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not *1186 expected to become factors in the formation of the verdict.' Bankhead, 585 So.2d at 106. `Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument.' Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id."
Freeman v. State, 776 So.2d 160 (Ala.Cr. App.1999).

A.
Taylor argues that the following portion of the prosecutor's closing argument during the guilt phase of trial amounted to an improper comment on the fact that Taylor had exercised his right to remain silent and encouraged the jury to draw an adverse interest from his silence. He also argues that it was an improper comment on Taylor's failure to "produce a witness supposedly unfavorable to that party if the witness is equally available to both sides," citing Hunt v. State, 453 So.2d 1083, 1087 (Ala.Cr.App.1984).
"No Brown and Root payroll clerk. No father to say that we have done some plumbing work or we had done some painting work. No papers on a 1989 Toyota Celica. The only way that we have any proof at all of money"
(R. 1435.)[9] At this point, Taylor objected to the argument as "trying to shift the burden." The trial court responded,
"I will instruct them on burden. The burden never shifts and I will instruct them further on that. The burden is always on the State, but the state is allowed to argue against things, which could be construed as doubts just as the State is entitled to argue in favor of its position. Go ahead."
(R. 1435.) Because Taylor for the first time on appeal argues that this was an improper comment on his right to remain silent and on his failure to call a witness equally available to both sides, we will review this for plain error only. Rule 45A, Ala.R.App.P.
A comment on the defendant's failure to testify is to be "scrupulously avoided." Arthur v. State, 575 So.2d 1165, 1186 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991). "Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated." Windsor v. State, 593 So.2d 87, 91 (Ala.Cr.App.1991), quoting Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969). "In a case where there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must be a close identification of the defendant as the person who did not become a witness." Windsor v. State, supra, quoting, Ex parte Williams, 461 So.2d 852 (Ala.1984).
"`Alabama law clearly holds that "[w]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const. of Alabama of 1901], is violated."' Ex parte Wilson, 571 So.2d 1251, 1262 (Ala.1990). However, `a prosecutor may legitimately base his argument on the evidence of the appellant's statement' *1187 to the police. Hereford v. State, 608 So.2d 439, 442 (Ala.Cr.App.1992). See also Henderson v. State, 584 So.2d 841, 855 (Ala.Cr.App.1988); Smith v. State, 588 So.2d 561, 570 (Ala.Cr.App. 1991); Kimble v. State, 545 So.2d 228, 230 (Ala.Cr.App.1989); Brinks v. State, 500 So.2d 1311, 1314-15 (Ala.Cr.App. 1986). `Argument by the prosecution concerning omissions and inconsistencies in the defendant's version of the case is not improper.' Salter v. State, 578 So.2d 1092, 1096 (Ala.Cr.App.1990), cert. denied, 578 So.2d 1097 (Ala.1991)."
Mosely v. State, 628 So.2d 1041, 1042 (Ala. Cr.App.1993).
From our review of the prosecutor's argument as a whole, we believe that the prosecutor was not commenting on Taylor's right to remain silent or his failure to call witnesses who were equally available to both sides, but was properly commenting on the inconsistencies of Taylor's statement to the police that he bought the automobile from Steve Dyas Motors for $13,700 in cash. This argument was not improper.

B.
Taylor argues that the prosecutor misstated the law to the jury when he made the following argument:
"Kenyatta McMillan walked us through the night of [the] gruesome murders. He gave you detail by detail using photographs [and] that diagram that is back in the corner there. He came down out here and walked you through it, step by step. And, maybe when you think about it, that's the strongest corroboration of all. He showed you where he was in there, what Jarrod Taylor was doing.
"When you look at these folksand you will see these pictures again; I am not going to flash them around in front of youbut of Sherry, Steve, and Bruce lying on the floor in there, I want you to think about how one man is supposed to have accomplished this; one man who walks in the front door, turns and shoots somebody; two other people go scrambling; one runs to a back room [while] one runs into another room. One person is going to go track one down [and] leave the other one out there. Those pictures and the diagram corroborate."
(R. 1401-02.) Taylor argues for the first time on appeal that this argument misled the jury by informing them that McMillan's testimony was self-corroborating. We review this for plain error. Rule 45A, Ala.R.App.P.
Our review of the argument indicates that the prosecutor was arguing that the very circumstances of the murders corroborated McMillan's testimony that both he and Taylor participated in the murders. We note that the trial court properly advised the jury that the arguments of counsel were not to be considered as evidence and instructed the jury to disregard any argument not supported by the court's instructions on the law, and subsequently gave complete instructions on the law of corroboration of an accomplice's testimony. (R. 1389-92; 1482-83.) The jury is presumed to abide by the trial court's instructions. Thus, we cannot say that the prosecutor's argument concerning corroboration "so infected the trial with unfairness ... that the appellant was denied due process." Jenkins v. State, 627 So.2d 1034, 1050 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). There is no plain error here.

C.
Taylor argues for the first time on appeal that the prosecutor improperly accused defense counsel of trying to deceive *1188 the jury and of lying to the jury when the prosecutor made the following argument:
"When we talk about lies, folks, I thinkthat is what I want to leave you with. When we start talking about lies over here, they are going to say, `Yeah, Kenyatta lied, lied, lied.' Let's remember some other lies. Ask yourself during your deliberations, `What about the lies that Jarrod Taylor told Tom Boteler, Blake Martin, Doneshia Matthews, Delois Smith.' Remember Ms. Smith. She said he told her he had already gone down here and bought him a car; already paid for it. Remember all those lies. Remember the lies that he told Sherry Gaston before she died."
(R. 1405-06.) We review this argument for plain error only. Rule 45A, Ala. R.App.P.
We find no fair inference from this argument that the prosecutor was accusing defense counsel of lying or of suborning perjury. Musgrove v. State, 638 So.2d 1347, 1353 (Ala.Cr.App.1992). The argument by the prosecutor was a legitimate inference to be drawn from the evidence.
"It is well settled that both the prosecutor and defense counsel have the right to present their impressions from the evidence. E.g., Cross v. State, 536 So.2d 155, 160 (Ala.Cr.App.1988); Sanders v. State, 423 So.2d 348, 351-52 (Ala.Cr. App.1982). In closing, counsel `may examine, collate, sift, and treat the evidence in his own way' and `may argue every matter of legitimate inference from the evidence.' Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."
Kitsos v. State, 574 So.2d 979, 983 (Ala.Cr. App.1990). There is no error here.

D.
Taylor argues that the prosecutor improperly brought out facts of a previous conviction of a defense witness while impeaching that witness on cross-examination. The prosecutor asked the following questions:
"Q: Mr. Clark, you were convicted this week of attempted murder and robbery in the first degree, weren't you?
"A: Yes, sir.
"Q: In the Circuit Court of Mobile County, Alabama. It was the video store clerk"
(R. 1277.) At this point, defense counsel objected to the question and the trial judge sustained the objection, noting that the prosecutor could question the witness only on his conviction, and not the details. (R. 1278.) Because the trial judge immediately sustained the objection and indicated that the prosecutor could not question the witness on the details of his offense, there is no adverse ruling from which to appeal. After the trial judge sustained the objection, Taylor did not raise any further objections, request any curative instructions, or move for a mistrial. Thus, considering the impact of the challenged question within the context of the trial, we do not find the prosecutor's question amounted to error. The trial court's sustaining of Taylor's objection was sufficient to eradicate any possible prejudice to Taylor. Melson v. State, 775 So.2d 857 (Ala.Cr. App.1999).
Taylor also argues that the prosecution "grossly misstated the direct testimony" of a defense witness in what he argues was an attempt to mislead the jury and confuse the witness. The record indicates that, during cross-examination of a defense witness, the prosecutor asked, "Now, let me make sure I understand exactly what you say McMillan told you *1189 about the crime at Steve Dyas Motors. That was that Yatt McMillanKenyatta McMillanand Jarrod Taylor went to Steve Dyas Motors and murdered three people; a woman and two men?" (R. 1280.) Defense counsel objected, arguing, "that's not even close to what he said...." The judge overruled the objection, stating, "It is cross-examination." (R. 1280.) When the examination continued, the witness answered the question, reiterating what he had testified to earlier.
The trial judge was correct. The question was proper cross-examination and the witness was allowed to correct the prosecutor on any misstatement concerning his direct testimony as to what McMillan had told him about the murders. Proper cross-examination of a witness is one of the surest ways of testing the truth of the testimony of any witness. When a witness is telling an unusual story, the court will always allow the examining attorney much latitude. Gebhardt v. State, 22 Ala.App. 643, 119 So. 247 (1928). Because the witness was a convicted felon testifying that he had heard the state's eyewitness claim responsibility for the murders, the trial judge did not err in allowing the prosecutor leeway in conducting cross-examination. There is no plain error.

E.
Taylor next argues that the prosecutor improperly emphasized the fact that the murders took place at Christmas, thus, he argues, causing undue prejudice and inducing the jury to return a capital murder conviction based on emotion. Taylor points to a number of occasions in which the prosecution introduced evidence or commented during argument that the murders took place several weeks before Christmas and that the victims were preparing to attend an office Christmas party the night they were killed. Specifically, Taylor argues for the first time on appeal that the prosecution referred to "capital murder at Christmas time" as a theme during arguments at the guilt phase and the sentencing phase. We review this claim for plain error only. Rule 45A, Ala. R.App.P.
The facts of this case indicates that the murders took place on December 12, two weeks before Christmas, and that the victims were supposed to attend their office Christmas party the evening they were killed. Partygoers left the Christmas party to search for their friends and discovered the victims' bodies at the car dealership office. As we stated earlier, the prosecution was free to "examine, collate, sift, and treat the evidence in his own way" and could "argue every matter of legitimate inference from the evidence." Kitsos v. State, supra. The fact that these murders took place at Christmas time was undisputed and the prosecution did not err in pointing that out in its arguments. There is no plain error here.

F.
Taylor next argues for the first time on appeal that the prosecutor improperly urged the jury to return a death sentence based on Kenyatta McMillan's behavior. He points to that part of the prosecutor's sentencing argument in which he stated, "We also understand that we are here because of the decisions that were made on December the 12th, of 1997, by Kenyatta McMillan and Jarrod Taylor." (R. 1577.) He also argues for the first time on appeal that the prosecutor improperly urged the jury to recommend the death sentence by urging the jury to look at the photographs of the victims, which, he argues, is not an aggravating circumstance that can be weighed in deciding whether to recommend a death sentence.
*1190 Taylor's interpretation of these opening comments during sentencing argument is strained and taken completely out of context. However, even if we were to find these comments improper, which we do not, it would be harmless because the jury returned a sentence recommendation of life imprisonment without parole. Burgess v. State, 723 So.2d 742, 768 (Ala.Cr. App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).

XVII.
Taylor argues that by overriding a jury recommendation for life imprisonment without parole, the trial judge violated the Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Fourteenth Amendment, and imposed a punishment that violates the constitutional proscription against cruel and unusual punishment found in the Eighth Amendment. Specifically, Taylor argues that to allow a trial court to override a jury recommendation and impose a death sentence results in the arbitrary and capricious imposition of the death sentence. He also argues that there is no standard of review for determining whether an override was appropriate in a given case. Because he raises these issues for the first time on appeal, we review them for plain error only. Rule 45A, Ala.R.App.P.
These precise issues have been decided adversely to Taylor by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). See Knotts v. State, 686 So.2d 431, 451-52 (Ala.Cr.App.1995), opinion after remand, 686 So.2d 484 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997). After reviewing the record of trial, we are convinced that the trial court complied with the sentencing scheme of Alabama's death-penalty statute and that the sentence it imposed, overriding the jury's recommendation, met constitutional requirements and was not arbitrary, discriminatory, or fundamentally unfair. Jackson v. State, [Ms. CR-97-2050, May 28, 1999], ___ So.2d ___, ___ (Ala.Cr.App.1999).

XVIII.
Taylor argues that the trial judge erred when it granted the State's request that Taylor be ordered to provide blood samples. Taylor argues that the State failed to show that its interest in obtaining the physical exemplars "outweighed his right to be free of such serious intrusions as collecting blood and other physical exemplars."
The record reflects that on June 9, 1998, the State filed a "Motion for the Taking of Samples," stating that a sample of Taylor's blood was needed for blood typing and for comparing with the victims' blood samples. (C. 24-25.) On the same day, Taylor filed an objection to the motion, arguing that the State had offered no "factual underpinnings" for the request. (C. 32.) On June 12, 1998, the State amended the motion, explaining that clothing taken from Taylor on the night of his arrest contained possible bloodstains and that samples of his blood were needed for a comparison with any blood from the clothing. (C. 26.) The trial judge conducted a hearing on the motion. At the hearing a police investigator testified that he observed what appeared to be bloodstains on clothing obtained during the search of Taylor's motel room and his automobile and that his investigation would be furthered by taking a blood sample from Taylor for a forensic comparison with the stains on the clothing. (R. 42-44.) The trial judge granted the State's motion. (R. 52.)
*1191 Rule 16.2, Ala.R.Crim.P., provides, in pertinent part:
"(b) Personal Physical Evidence. Upon motion of the state/municipality and solely in connection with the particular offense with which the defendant is charged, the court shall order the defendant to:
". . . .
"(6) Permit the taking of samples of defendant's hair, blood, saliva, urine, or other specified materials which involve no unreasonable intrusions into the body...."
The trial court properly granted the State's motion, pursuant to Rule 16.2, Ala. R.Crim.P. Under the circumstances of this case, the State's interest in obtaining the physical exemplars outweighed Taylor's right to be free from physical intrusions. Maples v. State, 758 So.2d 1, 74 (Ala.Cr. App.1999).

XVIX.
Taylor next argues that the trial court erred when it admitted several State exhibits without the items being clearly identified for the record. Specifically, Taylor objects to the admission of State Exhibit 38, a fired projectile:
"Q: All right. I show you state's exhibit number 38 and do you recognize that?
"A: Yes, sir.
"Q: I believe it is in a clear plastic bag so you don't have to open anything; is that correct?
"A: Yes, sir.
"Q: Do you recognize it? Is it in the same condition, substantially the same condition, as when you first saw it?
"A: Actually, I recovered this with the carpet. I turned the carpet and this into evidence.
"Q: All right. Is it in substantially the same condition, though?
"A: Yes, sir.
"MR. TYSON [Prosecutor]: All right. Judge, we would move state's exhibit number 38 into evidence.
"MR. HORNE [Defense counsel]: No objection.
(R. 633-34.) In regard to State exhibit 54, a buyer's guide from Steve Dyas Motors signed by Taylor, exhibit 55, an Alabama Department of Revenue form, and exhibit 74, an envelope containing photographs of Taylor, each was introduced in the same manner in open court. In each case, the witness, while not completely describing for the record what the item or document was, clearly identified the exhibit and acknowledged that each piece of evidence was in substantially the same condition as when the witness found it, and each was admitted into evidence without objection. Each piece of evidence, of course, has been preserved for appellate review and is a part of this record of trial. Because Taylor never objected to the admission of this evidence at trial, we review this issue for plain error only. Rule 45A, Ala.R.App.P.
The admission or exclusion of evidence is a matter within the sound discretion of the trial court. Arthur v. State, 711 So.2d 1031, 1077 (Ala.Cr.App.1996). In Alabama, there is no requirement for a witness to verbally identify an exhibit for the record in order to render it admissible. The trial judge did not err in admitting State exhibits 38, 54, 55, and 74. This argument is without merit.

XX.
Taylor argues that the omission of state exhibits 1, 51, and 58, as well as all defense exhibits, and the jury questionnaires from the record of trial renders the record so incomplete that this court cannot perform its required plain-error review. *1192 He also argues that because these exhibits are not a part of the record, he cannot fully brief this court on the errors below.
"Because of the statutory requirement of an automatic appeal in death penalty cases, the requirement that we search the record for plain error in such cases, the right to appeal, and because of an appellant's indigency, the state must afford such an appellant a record of sufficient completeness to permit review for plain error and to permit proper consideration of claims presented on appeal.
". . . .
"... Appellate courts do not follow a `mechanical approach' and automatically reverse a conviction because the transcript or record is less than complete. When the transcript or record is incomplete, two rules have evolved. The first applies to the situation where the appellant is represented on appeal by the same counsel that represented him at trial. In that case, the failure to supply a complete record is not error per se and will not work a reversal absent a specific showing of prejudice. In other words, in such a case, the appellant must show that failure to record and preserve the specific portion of the trial proceedings complained of visits a hardship upon him and prejudices his appeal."
Ingram v. State, 779 So.2d 1225 (Ala.Cr. App.1999) (citations omitted).
Our review of the record indicates that the transcript is complete. We agree with Taylor that the record does not contain copies of all the exhibits and the jury questionnaires. However, we find that Taylor, whose defense counsel is also representing him on appeal, has failed to meet his burden of specifically alleging how the missing copies of exhibits in the record have prejudiced his appeal. We note that the trial court earlier granted Taylor's motion to supplement the record with copies of state and court exhibits. Within that supplemental record, the clerk of the court noted that only State exhibits that could be copied were included in the supplemental record and certified that all State exhibits were in possession of the clerk's office and would be supplied upon request by this court. (S.R.10.)
Our review of the record indicates that the record is sufficiently complete for us to conduct a plain-error review. We also note that Taylor has the responsibility to make an effort to provide this court with those exhibits not included in the record if he believes they are necessary for additional arguments of error. Knight v. State, 621 So.2d 394 (Ala.Cr.App.1993). Taylor may not sit on his hands and claim error because of an incomplete record without making some effort to provide this court with those exhibits he believes important to his appeal. The record is not incomplete.

XXI.
Taylor next asserts that he was deprived of a fair trial because, he says, his trial was "infested with hearsay, despite the rule barring its admission." Taylor parenthetically cites this court to three different pages within a 1,718-page transcript, but he does not identify what specific objections he has to the testimony presented on those pages, nor does he apply the law to the testimony found on those pages.
"We in no way condone a party's reliance on the mere citing of page numbers from the record, without a discussion of the pertinent facts from those pages and application of the pertinent law to those facts. We consider such reliance an indication of a lack of merit of the contention the party asserts. Nonetheless, out of an abundance of caution, we will review [these] claims."
*1193 Hardy v. State, 804 So.2d 247 (Ala.Cr.App. 1999).
"Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."
C. Gamble, McElroy's Alabama Evidence, § 242.01(1)(a) (5th ed.1996), quoting Edward M. Cleary, McCormick on Evidence 584 (1972).
"There are two methods whereby one may circumvent a hearsay objection. The statement may qualify under one of the exceptions enumerated in Rule 803 or Rule 804 [of the Alabama Rules of Evidence]. Additionally, however, the statement may be definitionally non-hearsay under Rule 801."
McElroy's Alabama Evidence, § 242.01(1)(a).

A.
Taylor first cites us to pages 756-57 in the record. At that point in the record, the State is examining a witness who was an employee of a bank located near Steve Dyas Motors. The witness was testifying that he was escorting two customers from the bank at the close of business on December 12, 1997. He testified as follows:
"But when I was letting [the customer] out I heard what I thought was a couple of gunshots. I said, `Did you hear that? It sounded like a gun.'"
(R. 756-57.) Taylor made no objections to this testimony at trial and we review it for plain error only. Rule 45A, Ala.R.App.P.
The definition of hearsay includes a statement made outside the trial by a declarant who takes the witness stand at trial to recount the previous statement and is subject to cross-examination. Ex parte Snell, 565 So.2d 271 (Ala.1990). Thus, the comment "Did you hear that? It sounded like a gun" fits within the broad definition of hearsay. However, it also fits squarely within the "present-sense impression" exception to the hearsay rule. Present-sense impression is "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), Ala.R.Evid.
"The event and the statement that describes or explains the event must be substantially contemporaneous. It is this closeness in time, negating the likelihood of deliberate conscious misrepresentation, that provides the requisite trustworthiness to satisfy hearsay concerns. See Fed.R.Evid. 803(1) advisory committee's note.
"The declarant must have perceived the event or condition described. There is no requirement, however, that the declarant have participated in it. The subject matter of a permissible declaration is limited to a description or explanation of the event or condition."
Advisory Committee's Notes to Rule 803(1), Ala.R.Evid.
The hearsay statement recalled by the witness in which he contemporaneously described what to him sounded like a gunshot, is a textbook example of the present-sense-impression exception to the hearsay rule. There is no plain error here.

B.
Taylor next cites page 833 in the record. At that point in the record, the prosecution was eliciting testimony from a witness who, in the days before the murders, had driven Taylor and McMillan from Selma to Mobile. The witness testified that, as they drove to Mobile, Taylor and McMillan were pointing out different banks and bank ATM machines and discussing *1194 which ones would be good to rob. The defense objected to this testimony as being inadmissible hearsay. The trial judge overruled the objection, making the following ruling:
"Now then, on the topic of hearsay, when people are making a plan or hatching a plot or discussing their present motives, intentionsthings like that that is not hearsay. When we refer to hearsay, we mean that the declarant is giving an account of something else basically for something else or something that has transpired that the declarant has observed or is recounting. But where people are creating a fact between themselves, such as creating a contract by their words or hatching a plot or developing a plan or whatever, then that's the fact itself. That is the creation of a fact itself, rather than a hearsay account of some other fact. So, the hearsay objection is not going to apply.
"There has been an objection that the witness can't say who said what, but where we are dealing with two people either showing a predisposition to rob or to steal or hatching a plot, if one makes a suggestion and the other agrees, then that is probative in itself. It doesn't really matter. It is not crucial which one has made the suggestion and which one has done the agreeing. In other words, it is not crucial to admissibility. It is something for the jury to consider that they don't know who made the suggestion and who agreed. But a suggestion and an agreement, like an offer and an acceptance, creates a complete whole which may have evidentiary significance."
(R. 829-830.) The trial judge was correct. The conversation between the two coconspirators took on a relevance of its own, regardless of the truthfulness of the statement, and was thus not hearsay. Rule 801(c) and (d)(2), Ala.R.Evid.; McElroy's Alabama Evidence, § 242.01(c)(1).

C.
The third cite to the record by Taylor was to page 869. On that page, a State witness recounted a conversation she had with Taylor:
"He was telling me about in these days and times you have to have a gun in order to protect yourself and I responded, `This is true.'"
(R. 869.) This statement was preliminary to testimony that Taylor had showed the witness a weapon, which the witness then described. (R. 870.) Because Taylor never objected to this statement, we review it for plain error only. Rule 45A, Ala. R.App.P.
If Taylor is now objecting to the recounting of what he told this witness, his objection is without merit. The statement Taylor made to this witness was relevant to the issues in the case and was properly offered against him. Taylor's statement is simply not hearsay. Rule 801(d)(2), Ala. R.Evid.
If Taylor is now objecting to the witness's recalling her response to Taylor, "This is true," such a statement, even if it is technically hearsay, is so innocuous as to be completely harmless. That admission of that testimony did not affect the substantial rights of Taylor and did not, in any manner, affect the fairness or integrity of the judicial process. It is not plain error. Bush v. State, 695 So.2d 70, 87 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).

XXII.
Taylor argues that the trial court erred when it allowed Warden Rick Gaston to testify as a rebuttal witness, after he *1195 had been allowed to remain in the courtroom when three defense witnesses, who were prisoners in the warden's jail, testified about how prisoners communicated between sections of his jail. Warden Gaston was called as a witness to describe the layout of the jail and the ability of prisoners to communicate between the different sections of the jail. In objecting to Gaston's being called as a witness after being allowed to hear the defense witnesses testify, Taylor's attorney acknowledged that the warden was present in the courtroom for security reasons and that the prosecutor could not always identify rebuttal witnesses, but he argued that Gaston had been "polluted" by hearing the prisoners's testimony and that he should be barred from being a witness. The trial court overruled the objection, noting that if Gaston was being called to describe the layout of his jail, there was little likelihood of his being "polluted" by his presence in the courtroom during the testimony of the defense witnesses. (R. 1322-23.)
"Rule 9.3(a), Ala.R.Crim.P., authorizes the trial court to exclude potential witnesses from the courtroom prior to or during proceedings. The Committee Comments to Rule 9.3(a) state that `the power to exclude and separate witnesses is entirely a matter of discretion with the trial court.' The Comments cite Teague v. State, 245 Ala. 339, 16 So.2d 877 (1944); and Beddow v. State, 39 Ala.App. 29, 96 So.2d 175 (1956), cert. denied, 266 Ala. 694, 96 So.2d 178 (1957), cert. denied, 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414 (1958).
"... `Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of a trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial.' Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991) (citing several Alabama cases holding to same effect)."
Weaver v. State, 710 So.2d 480, 484 (Ala. Cr.App.1997).
Rule 615, Ala.R.Evid., also gives the trial court the discretion of whether to exclude witnesses from the courtroom. However, the Rule 615 Advisory Committee Notes state that "rarely should the court exercise its power to exclude the testimony of a witness who has violated the court's sequestration order." The trial court's decision as to whether the witness will be permitted to testify is not subject to review. Whitehead v. State, 777 So.2d 781, 802 (Ala.Cr.App.1999).
Taylor has not shown how he was prejudiced by the trial court's decision and he has not shown that the trial court abused its discretion in allowing Warden Gaston to testify. Because Gaston was in the courtroom for security purposes and was a rebuttal witness, Taylor has failed to show that Gaston was even subject to the court's sequestration order or that he purposely disobeyed the court's order. The trial court did not err in allowing Warden Gaston to testify as a rebuttal witness.

XXIII.
Taylor argues that the trial court improperly excluded jurors who had expressed reservations about imposing the death penalty. Once again, Taylor cites this court to nine pages in the record of trial, but does not identify his specific objections to the court's decisions to remove these jurors from the venire, nor does he apply any law to these specific strikes. As we stated before, we consider such reliance an indication of a lack of merit of the contention Taylor now makes. Hardy v. State, supra.
*1196 The first portion of the transcript Taylor cites refers to veniremember B.Y., who, after informing the judge that she did not believe that she could sentence someone to death, was questioned by the trial judge as follows:
"COURT: Is there any conceivable set of facts for a killing, a murder, or can you in your mind envision any conceivable set of facts or circumstances under which a murder could be committed that would be sufficiently bad for you to vote for the death penalty, if the law provided for the death penalty?
"B.Y.: I don't think so, sir. I don't believe so, sir."
(R. 230.) After counsel asked the same sort of questions again, B.Y. again reiterated her answer, stating, "That's the way I feel." (R. 231.) The trial court then granted the State's challenge for cause; defense counsel objected, stating: "Judge we would just object to the court's granting it in light of the fact they haven't been given the cautionary instruction regarding the penalty phase."
Taylor next cites this court to veniremember P.A., who informed the court that there was no set of circumstances under which she could impose the death penalty. (R. 449-50.) After defense counsel put forth hypothetical situations in questioning her ability to consider the death penalty, P.A. confirmed her beliefs, stating, "[W]e have to consider that there is another power that they have to answer to and I could not do that." (R. 452-53.) The trial court granted the State's challenge for cause without an objection by Taylor.
Taylor next refers to veniremember L.J., who told the trial judge that there is no set of circumstances under which he could impose the death penalty. (R. 454.) After defense counsel questioned him regarding different hypothetical situations and whether he could consider the death penalty, L.J. responded, "I believe in giving them time, but not the death penalty." (R. 455.) The judge granted the State's challenge for cause and Taylor made a general objection.
Next, Taylor cites us to the voir dire of veniremember D.W., who stated that there were no conceivable set of aggravating circumstances, no matter how completely proved, under which she would vote to impose the death penalty. Under questioning by counsel, she added that there were no circumstances under which she could consider the death penalty as a punishment. (R. 456-57.) The judge granted the State's challenge for cause, noting the defense's general objection.
Taylor's next citation is to veniremember L.P., who, after confirming that she could not vote for the death penalty under any circumstances, stated, "I was brought up a Catholic and we were always taught, `thou shalt not kill.' I would still not be able to make this judgment because they always taught us, you know, to let God handle it. So, I couldn't do it." (R. 460.) Additional questioning only confirmed L.P.'s conviction that she could not consider the death penalty as a possible punishment. The trial judge granted the State's challenge, noting the defense's general objection.
Taylor next refers the court to page 467 in the record. In these pages is the voir dire of veniremember B.H. B.H. confirmed to the trial judge that there were no circumstances under which she would vote for the death penalty. However, under questioning by counsel, the following occurred:
"MR. POWELL [defense counsel]: Ms. H., you said that you don't think that you could [vote for the death penalty]. If there were a set of facts proven to youif you were a juror in a case and it *1197 was the most horrible set of facts you had ever seenthe slaughter of innocent children by someone that showed no remorse whatsoeverthat is a horrible set of factswould you, if you were a juror in this case, would you follow the court's instruction as to the law and give considerationjust considerationto the death penalty as a possible punishment? Not whether you would vote or not vote for the death penalty, would you consider it?
"B.H.: I would."
(R. 464.) The trial judge then expressed his concern that a juror's ability to recognize the legal existence of the option was not the telling point in death-penalty qualification. He said, "I think it is whether the imposition of the death penalty is a viable option to her, even though it might be only in the most aggravated and unmitigated situation." The judge then invited counsel to rephrase their questions to B.H. in terms that did more than acknowledge the juror's "recognition of the existence of the law." Defense counsel then questioned B.H. as follows:
"MR. POWELL: Ms. H., if the most horrible set of facts imaginable were proved to you as a juror, would you be able to follow the court's instruction as to the law and give consideration to the death penalty as a possible punishment in that particular case?
"B.H.: I couldn't vote on death.
"MR. POWELL: Under any circumstances?
"B.H.: Not on death."
(R. 466-67.)
The trial judge then granted the State's challenge for cause, noting the defense's general objection.
Taylor next cites the pages referring to veniremember N.L. N.L. responded to the court's and counsel's questions affirming his inability to impose or to consider the death penalty under any circumstances. (R. 468-69.) The trial court granted the State's challenge for cause. There was no objection by defense.
Taylor next cites us to that portion of the record referring to veniremember M.W. When asked her feelings about imposing the death penalty, M.W. responded:
"My feelings are: That I cannot in good conscience be a part of capital punishment. I cannot and that's my personal belief and that is my faith. I am not going to be a part of taking life. God gives life. I hate what has happened in this situation but, I, myself ... will not be a part of sentencing another human to death. No."
(R. 471.) The trial court granted the State's challenge for cause without objection.
Lastly, Taylor refers us to page 478 of the record where veniremember V.K. was questioned concerning her position on the death penalty. When the trial court asked V.K. whether she could conceive of a circumstance that would be sufficient for her to consider imposing the death penalty, she answered:
"I can't say that as cut and dried. I mean, you seem toI am saying, it would be very difficult given the two options for me to ever considerI mean; I feelI have difficulty with the idea of the state executing ... I don't like it. I have never liked it. And, if I had the option between a life sentence without parole and the death penalty, I would choose the life sentence because I don't feel I have the right to say that somebody should die.
"There are instancesI had a long time to sit in there and think. With Timothy McVeigh, if they said they would let him go instead of executing him, I would say, *1198 `Don't let him go,' you know, if that's what we have to do. That would be a terrible thing, I think. I am lowering myself to"[10]
(R. 474-75.) After that answer, the trial judge tried to explain to V.K. that the two options in sentencing were not the death penalty or letting the convicted person go, but the death penalty or life imprisonment without the possibility of parole. His questioning then continued:
"THE COURT: ... I need for you to examine your brain and tell me whether there is any conceivable situation that the state could prove, any conceivable set of
"V.K.: I suppose there would be a conceivable situation
"THE COURT:under which youso aggravated, so completely proved and so unmitigated that you would impose the death penalty. Is there?
"V.K.: Oh, Judge Johnstone, I would say, no. No, there is not. Okay."
(R. 476-77.) The judge then granted the State's challenge for cause and the defense objected, noting that V.K. said she could conceive of a situation where she would consider the death penalty. The trial judge said, "Well, she waffled off of it and stayed off of it. So I think she is not going to give the state its due." (R. 478.)
"The `original constitutional yardstick' on this issue was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under Witherspoon, before a juror could be removed for cause based on the juror's views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the veniremember's views would `"prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' The Supreme Court has expressly stated that juror bias does not have to be proven with `unmistakable clarity.' Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)."
Pressley v. State, 770 So.2d 115, 127 (Ala. Cr.App.1999), aff'd, 770 So.2d 143 (Ala. 2000).
After reviewing the voir dire examination of these veniremembers, we conclude that the trial court did not err in granting a challenge for cause against any of them. In each case, the trial court could reasonably have concludedwhen assessing the concerns and comments of these veniremembers regarding their ability to consider or impose the death penalty, in conjunction with their demeanorthat each of *1199 these veniremembers unequivocally believed that he or she could not impose the death penalty, regardless of the evidence presented, or that their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions of the court and their oath. See Watkins v. State, 509 So.2d 1071, 1073 (Ala.Cr.App. 1986), aff'd, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), and the cases cited therein. Their was no error, plain or otherwise, in the court's granting the State's challenges for cause against these nine veniremembers.

XXIV.
Taylor next argues that he was subjected to double jeopardy when the State was allowed to "double-count" the robbery component of the capital murder offense as an element of the offense and also as an aggravating circumstance during the penalty phase. Taylor also makes a conclusory statement, without argument, that this "double-counting" also violates his "right to Due Process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law."
This argument is without merit, however, because the practice of permitting the use of an element of the underlying crime to also be used as an aggravating circumstance has long been held to be constitutionally permissible and is allowed by Alabama law. Coral v. State, 628 So.2d 954, 965-66 (Ala.Cr.App.1992); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Maples v. State, 758 So.2d 1 (Ala.Cr.App.), aff'd, 758 So.2d 81 (Ala.1999).

XXV.
Taylor next argues that he was denied a fair and representative jury of 12 jurors, each voting on an equal basis, because, he argues, the trial court arbitrarily bestowed heightened authority upon the foreperson of the jury. During its oral instructions to the jury, the trial court stated:
"I am going to ask you to go in the jury room and do one thing and one thing only, and that is to choose your foreperson. Now, the foreperson is the moderator of your discussions. The foreperson keeps the discussion going around the table without having too many people talk all at once. The second function of the foreperson is that he or she will sign each verdict form in accordance to the way the jury decides on that particular count. Other than that, other than those two functions, the foreperson has no greater vote than any of the other jurors. In fact, it is an absolute statement that the vote of the foreperson is no greater than the vote of any other juror. But, rather, that the foreperson's only functions are the moderator function and the signing function."
(R. 1500.) Because Taylor did not object to this instruction at trial, we review this claim for plain error only. Rule 45A, Ala. R.App.P.
Taylor argues that the "moderator function" referred to by the trial court is without basis in the law and "such power diametrically increased the authority of that person and concatenately decreased the authority and weight given to the views held by the remaining jurors."
This argument is without merit; it completely ignores the court's clear instructions to the jury that the jury foreperson's vote carried no greater weight than any *1200 other juror. When viewed in context with the trial court's complete instructions on how the jury was to proceed with its deliberations, the trial court did not bestow heightened authority on the jury foreperson and did not diminish the importance of the remaining jurors' votes. Maples v. State, supra. There is no plain error here.

XXVI.
Taylor argues that the trial court erred when it allowed 11 members of the 3 victims' families to be present in the courtroom and when the court introduced those family members to the jury. Taylor argues that this "expanded presence" of family members in the courtroom "injected irrelevant and plainly inflammatory considerations into his trial." Because Taylor made no objection regarding this claim at trial, we review it for plain error only. Rule 45A, Ala.R.App.P.
Taylor's right to a fair trial does not require that the victims' family members be barred from the courtroom for the entire trial.
"To the contrary, the Alabama Crime Victims' Court Attendance Act, §§ 15-14-50 to 15-14-57, Ala.Code 1975, guarantees a victim or the victim's representative the right to be present in the courtroom and to be seated at the prosecution table. This right applies in capital cases. See Weaver v. State, 678 So.2d 260, 272 (Ala.Cr.App.1995), rev'd on other grounds, 678 So.2d 284 (Ala. 1996). Moreover, this court has held on numerous occasions that a victim's family should not be excluded from the trial without a valid reason. See, e.g., Few v. State, 518 So.2d 835, 836 (Ala.Cr.App. 1987), and cases cited therein."
Burgess v. State, 723 So.2d 742, 756-57 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).
The decision whether to exclude persons from the courtroom during trial is a matter left entirely to the trial court's discretion. See Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). Taylor has failed to show a valid reason why the victims' family members should have been excluded from the trial. Thus, we find no abuse of discretion in the trial court's failure to sua sponte bar the family members from the courtroom. Whitehead v. State, 777 So.2d 781 (Ala.Cr. App.1999).
Regarding Taylor's complaint that the trial court exacerbated the prejudice of the family members' presence by introducing them to the jury, we note that Taylor filed a motion before trial seeking to disqualify all veniremembers who knew the victims or members of their families. (C. 91-92.) Therefore, during voir dire, the trial court pointed out the victims' family members who were present in the courtroom and asked them to identify themselves to the jury. The court then asked the veniremembers if they were related to, had seen, or knew any of the family members. (R. 173-79.) The trial court had earlier done the same thing with Taylor and his family members. (R. 138-43.) We find this introduction of family members of the defendant and of the victims was a necessary part of voir dire, and was accomplished at Taylor's request. This voir dire did not "grossly exacerbate" any prejudice to Taylor by the victims' family members presence in the courtroom, and, if it did, was invited by Taylor himself. Gaddy v. State, 698 So.2d 1100, 1144 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, *1201 139 L.Ed.2d 613 (1997). There is no error, plain or otherwise.

XXVII.
Taylor next argues that the death sentence was impermissibly disproportionate to the sentence promised his codefendant, Kenyatta McMillan, who, pursuant to a plea agreement, was sentenced to life imprisonment without parole in return for his testimony.
Section 13A-5-53(b)(3), Ala.Code 1975, requires this court to determine whether the sentence of death is disproportionate to the penalty imposed in similar cases. However, "while our statute obliges us to consider the punishment given any accomplices, it does not require that every defendant involved in a crime receive the same punishment." McNair v. State, 706 So.2d 828, 845 (Ala.Cr.App. 1997). Each case must be evaluated on its own peculiar facts, and the fact that, in this case, the evidence indicates that Taylor was the triggerman is sufficient to distinguish him from McMillan and his role from McMillan's role in the murders. When reviewing all the facts of this case and the roles Taylor and McMillan played in the murders of the three victims, Taylor's sentence was not disproportionately severe when compared to the sentence received by McMillan. Wright v. State, 494 So.2d 726 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987).

XXVIII.
Taylor argues that the evidence was insufficient to support the jury's verdict of guilty of capital murder. The substance of Taylor's argument is that the sole source of the evidence that put the gun in Taylor's hand and identified Taylor as the person who mercilessly gunned down the three individuals at Steve Dyas Motors on December 12, 1997 was Kenyatta McMillan. Taylor argues that his convictions should not stand on the testimony of an accomplice who made a plea agreement with the State in return for his testimony. Although Taylor couches his argument in terms of weight of the evidence, we will review it as an argument addressing the sufficiency of the evidence.
"`In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact.' Maddox v. State, 620 So.2d 132, 133 (Ala.Cr.App.1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the state's evidence established a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). A trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). Furthermore:
"`"A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust."'
"McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App.1995), quoting Cox v. State, 500 So.2d 1296 (Ala.Cr.App.1986), quoting other cases."
*1202 Freeman v. State, 776 So.2d 160 (Ala.Cr. App.1999).
The evidence in this case, when viewed in a light most favorable to the prosecution, established a prima facie case against Taylor for the three counts of robbery/murder and one count of murder of two or more people pursuant to one scheme or course of conduct. The evidence, as we have set out earlier in this opinion, establishes that Taylor was the ringleader in a plot that involved the theft of the murder weapon, a day-long deception of the sales people and the owner at Steve Dyas Motors, the deliberate murder of three people in the course of the robbery of Steve Dyas Motors in order to steal what Taylor believed was a safe-full of money at the dealership and an automobile, the subsequent disposal of incriminating evidence, and a quick getaway to another city.
Whether McMillan was worthy of belief as an eyewitness accomplice, considering the plea agreement he had made with the State, was a question properly before the factfinders. It was the jurors' role to determine what weight should be assigned to his testimony. We will not reweigh that evidence and substitute our judgment for that of the jury. Burgess v. State, 811 So.2d 557, 594 (Ala.Cr.App.1998), aff'd as to conviction, rev'd and remanded as to sentence, 811 So.2d 617 (Ala.2000).
The evidence was sufficient to establish a prima facie case against Taylor on each count. There was no error here.

XXIX.
Taylor next argues that crime scene photographs, State's exhibits 3 through 26, which included photographs of the victims, were erroneously admitted into evidence and that they served no other purpose than to arouse the passion and prejudice of the jury. We note that at the time the State offered these exhibits into evidence, Taylor's counsel, having reviewed the photographs, stated, "We have previously looked at these and agreed with the prosecution. We have no objection to those. Admit them in evidence subject only to our cautionary instruction we have requested." (R. 622.) Based on this agreement between Taylor and the prosecution, the trial judge admitted the photographs and then gave the jury the following cautionary instruction:
"Ladies and gentlemen of the jury, you are about to view certain photographs. Some persons might consider some of these pictures to be gruesome.... The purpose of permitting you to view these photographs is not to inflame you. The photographs are admitted into evidence in the trial of the case to prove or to disprove some disputed or material issue. They are admitted to illustrate or to elucidate some other relative fact or evidence offered or to be offered. The fact that a photograph is gruesome is not grounds to exclude it from view as long as the picture sheds light on the issues being tried. In letting you view these photographs it is not intended that they inflame your mind. The sole purpose of admitting these photographs into evidence is to assist you in determining the facts and the issues in this case."
(R. 624.)
Taylor's agreement with the State to introduce the photographs into evidence with a cautionary instruction forecloses his present claim of error. A party cannot assume inconsistent positions at trial and on appeal, and a party cannot allege as error proceedings in the trial court that were invited by him or that were a natural consequence of his own action. Leverett v. State, 462 So.2d 972, *1203 976-77 (Ala.Cr.App.1984), cert. denied, 462 So.2d 972 (Ala.1985). This invited-error rule applies in capital cases. However, we will still conduct a plain-error review. Ex parte Bankhead, 585 So.2d 112, 116 (Ala. 1991).
The trial court's cautionary instruction to the jury was a correct application of the law on the admissibility of gruesome photographs before a jury and is what we shall apply in our review for plain error.
"`... The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury.'
"Bankhead v. State, 585 So.2d 97, 109 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.), on remand, 585 So.2d 133 (Ala.Cr.App.1991); Ex parte Siebert, 555 So.2d 780 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Lawhorn v. State, 581 So.2d 1159 (Ala. Cr.App.1990), aff'd, 581 So.2d 1179 (Ala. 1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).
"The state had the burden of proving that the [victims were] dead, and [these photographs were] direct evidence on that point. Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence."
Jenkins v. State, 627 So.2d 1034, 1044 (Ala.Cr.App.1992), aff'd 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).
The trial court properly admitted the crime scene photographs into evidence and correctly cautioned the jury as to their proper use. There is no error here, plain or otherwise.

XXX.
Taylor next argues that the manner of execution, i.e., electrocution in the electric chair, constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law. We have repeatedly held that the death penalty is not per se cruel and unusual punishment and that the electrocution as a means of capital punishment does not constitute cruel and unusual punishment. Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).

XXXI.
Taylor next argues that the trial court erred in not sua sponte moving the trial to another venue because of alleged extensive pretrial publicity. Taylor never moved for a change of venue before the trial court, nor did he present any evidence before the trial court concerning pretrial publicity. The only evidence before us now concerning pretrial publicity is the answers to voir dire questions concerning the jurors' knowledge of the case as a result of media coverage. We will review this issue for plain error only. Rule 45A, Ala.R.App.P.
Media publicity can prejudice prospective jurors and thereby result in a denial of a defendant's right to an impartial jury. Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). In order to get a change of venue based on pretrial publicity, the defendant must prove that there existed actual prejudice against the defendant as a result of the publicity or that the community was saturated with prejudicial publicity. Sheppard *1204 v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Newspaper articles or widespread publicity, without more, is insufficient to grant a motion for a change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978).
Our review of the voir dire examination concerning pretrial publicity indicates that, while many veniremembers had heard something about the case from the media, there were no grounds to warrant a change of venue. See, Stewart v. State, 730 So.2d 1203, 1241 (Ala.Cr.App.1996). No plain error occurred in the trial court's failure to sua sponte order a change of venue.

XXXII.
Taylor next argues that the Alabama statute limiting court-appointed attorney's fees to $1000 for out-of-court expenses for each phase of a capital trial violates the separation of powers doctrine, constitutes a taking without just compensation, and violates the Equal Protection Clause. We review this claim for plain error only. Rule 45A, Ala.R.App.P.
This court and the Alabama Supreme Court have repeatedly considered constitutional challenges to the statutes governing the compensation of counsel in indigent cases, including capital cases, and have repeatedly rejected them. See Burgess v. State, 811 So.2d 557 (Ala.Cr.App.1998), aff'd as to conviction, rev'd and remanded as to sentence, 811 So.2d 617 (Ala.2000), for a comprehensive list of cases dealing with this issue. In accordance with our earlier holdings on this issue, we find no plain error here.[11]
In a footnote in the section of his brief addressing this issue, Taylor asserts without providing any argument or citations to caselaw or statutes, that his right to adequate counsel was also violated by the court's order that he pay $1000 in costs to offset the cost of his appointed counsel. We review this claim of error for plain error. Rule 45A, Ala.R.App.P.
The record reflects that the trial court, as a part of its sentence, ordered Taylor "to contribute $1000 toward the expense of his appointed counsel." The court ordered that this sum, with other costs and restitution, was "to be paid from any assets owned by or available or accruing to the defendant now or hereafter." (C. 6.)
Rule 6.4(f), Ala.R.Crim.P., in pertinent part, provides as follows:
"(f). Contribution by the Defendant. If the court finds that a defendant for whom counsel has been appointed had, at the time counsel was appointed, or subsequent thereto has acquired, financial resources that enable the defendant to offset all or part of the costs of the legal services which have been or are to be provided, the court shall order that defendant to pay to the state or to the appointed attorney, through the clerk of the court, such amount as the court finds the defendant is able to pay without incurring substantial hardship. Failure to obey an order under this section shall not be grounds for contempt or grounds for withdrawal by the appointed attorney, but an order under *1205 this section shall be assessed as part of the court costs."
Rule 26.11, Ala.R.Crim.P., also provides procedures for an indigent defendant to follow if the imposed court costs result in a substantial hardship. These procedures allow a trial court, upon a finding that a defendant is indigent and incapable of making such a payment, to reduce the amount of the court costs, to modify a payment schedule, or to release the indigent defendant from his obligation to make such a payment. There is no evidence in the record that Taylor is so indigent that he is incurring a substantial hardship as a result of this ordered court cost or is financially unable to pay for part of his appointed attorney's fees and expenses, or that he has ever petitioned the court to be relieved of his obligation. Taylor does not even assert how the court's order affected his right to adequate counsel, either at trial or on appeal. This argumentraised in a footnote but not addressedis without merit.

XXXIII.
Taylor next argues that the trial court gave "numerous" improper jury instructions, both during the guilt phase and the sentencing phase at trial. We will review these allegations of improper instructions individually, separating the guilt-phase instructions from the sentencing-phase instructions.
We have recently reiterated the well-established principles to be applied in reviewing jury instructions:
"`A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonable not a strainedconstruction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984).'
"Williams v. State, 710 So.2d 1276, 1305 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
"`A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr. App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).'
"Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992)."
Maples v. State, 758 So.2d at 64 (quoting Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Cr.App.1995)).

GUILT-PHASE INSTRUCTIONS.

A.
Taylor first argues that the following portion of the trial court's instruction on capital murder was error:
"You cannot convict the defendant of the capital offense, if he did not kill, attempt to kill, or intend that a killing take place in the capital offense alleged in the indictment. Stated otherwise, unless the state proves beyond a reasonable doubt that Jarrod Taylor either killed an alleged victim in this case, attempted to kill him, or intended that he or she be killed, then you cannot find Jarrod Taylor *1206 guilty of the capital offense as to that particular victim."
(R. 1473.) Taylor argues that this portion of the trial court's instruction on capital murder, through its use of "the disjunctive either/or," allowed the jury to convict him of capital murder under any one of three theories: 1) that he killed somebody, 2) that he intended to kill someone, or 3) that he attempted to kill one of the three victims. Taylor argues that this instruction lowered the State's burden of proof and allowed the jury to convict him of capital murder without a finding that Taylor had the intent to kill. Because Taylor did not object to this instruction at trial, we review it for plain error only. Rule 45A, Ala. R.App.P.
A review of the trial court's complete instructions on capital murder makes it clear that the trial court did not lower the State's burden of proof, nor did its instructions allow the jury to convict Taylor without finding that he had the specific intent to kill. (R. 1468-73; 1504-12.) The complained-of sentences have been taken out of context from that portion of the trial court's instruction on capital murder, in which the trial court was explaining that Taylor could not be convicted of capital murder as a "non-killing accomplice" unless the jury found he shared the specific intent to kill of the "trigger-man," versus an intent to commit the underlying felony alleged in the capital murder indictment. Those two sentences that Taylor alleges create error, when taken in context with the complete instruction, become part of a complete and correct instruction on the requirements to convict for capital murder. There is no plain error here. King v. State, 595 So.2d 539 (Ala.Cr.App.1991).

B.
Taylor continues his argument by alleging error in the following portion of the trial court's instruction on the definition of murder:
"A person commits the crime of murder if he intends to kill another person and with that intent in his own brain, not somebody else's brain, but in his own brain, he, in person, or through an accomplice does kill the person he intends to kill or another. That is murder."
(R. 1468.) Taylor argues, for the first time on appeal, that the phrase within that sentence, "somebody else's brain," made the instruction "bizarre and highly confusing" and misinstructed the jury that the intent of an accomplice may serve to establish the intent of the defendant. This argument is a strained and wholly unrealistic interpretation of a plain and accurate definition of murder. The complained-of language, when taken in context with the trial court's complete instruction, is a proper instruction and could not have been misinterpreted as alleged by Taylor. "`Fanciful theories based on vagaries of the imagination' should not be indulged in construing the court's charge." Addington v. State, 16 Ala.App. 10, 19, 74 So. 846 (1916). This issue is without merit.

C.
Taylor next complains, for the first time on appeal, of the trial court's instruction on reasonable doubt. The trial court began its definitional instruction on reasonable doubt as follows:
"Now, I have been telling you that if you have a reasonable doubt of the defendant's guilt, you must find him not guilty."
(R. 1485.) Taylor now argues that this sentence authorized the jury to convict him if they were persuaded of his guilt to a reasonable doubt, rather than beyond a reasonable doubt, thus lowering the State's burden of proof. This argument completely *1207 ignores the instruction that followed that sentence:
"Well, what do we mean by reasonable doubt? A reasonable doubt is a doubt for which you have a real or substantial explanation. A reasonable doubt is a reasonable explanation of the evidence or lack of evidence under which the defendant would be not guilty.
"A reasonable doubt may arise from any part of the evidence or from a lack of evidence. But the reasonable doubt which entitles an accused to an acquittal is not a mere guess or surmise and it is not a forced or capricious doubt or a fanciful, vague, conjectural, or speculative doubt. Instead, it is such a doubt as reasonable, fair-minded and conscientious men and women would entertain after a careful consideration of the evidence and any lack of evidence introduced in this case.
"Now, you will observe that the state is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond all reasonable doubt. I further instruct you that if two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, it is the duty of the jury to adopt the conclusion of innocence."
(R. 1485.) The trial court's instruction on reasonable doubt was correct and complete. Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The language used in the trial court's introduction to its definition of reasonable doubt could not, under any reasonable interpretation, have been interpreted to lower the State's burden of proof.
Taylor also complains that use of the word "simply" in the sentence "Now, you will observe that the state is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond all reasonable doubt," minimized the State's burden, relieved the State of its evidentiary obligations, and minimized the jury's sense of responsibility. He also makes the same allegation concerning that point in the record where the trial court reinstructed the jury on the elements of capital murder and the lesser-included offenses. At the end of that reinstruction, the trial court reminded the jury of its obligation to acquit Taylor if it harbored a reasonable doubt as to any of the elements of the offenses, concluding with, "I say all of those things in my effort to cover all the bases." (R. 1513.) Taylor argues that the phrase "cover all the bases" gave the impression that convicting beyond a reasonable doubt was a mere formality and minimized the jury's sense of responsibility. As before, because Taylor never objected to the use of these words at trial, we review these allegations of error for plain error only, Rule 45A, Ala.R.App.P.
Taylor's parsing the court's instructions on reasonable doubt to find error is without merit. The trial court repeatedly emphasized throughout its instructions the State's burden to prove the defendant's guilty beyond a reasonable doubt. We note that the trial court instructed the jury no fewer than 14 times during its initial charge that the State had to prove guilt beyond a reasonable doubt and that, during its reinstruction, the trial court constantly reminded the jury of the state's burden of proof. (R. 1459, 1465, 1469, 1470, 1472-73, 1474, 1475, 1476, 1477, 1478, 1485, 1490, 1491, 1492, 1505-13.) To conclude that the trial court minimized the state's burden in the mind of the jury by its choice of words is simply not supported by the record. Kennedy v. State, 472 So.2d 1092, 1103 (Ala.Cr.App.1984). There is no plain error in the court's instructions on reasonable doubt.

D.
For the first time on appeal, Taylor complains that the court's reinstruction *1208 on felony murder was "nonsensical," thus eliminating the possibility of the jury's consideration of felony murder as a lesser-included offense under count one of the indictment which charged the murder of two or more persons pursuant to one scheme or course of conduct. The trial court reinstructed the jury on felony murder as follows:
"There is another type of murder which you could consider and that is suppose I really think that is the only type of noncapital murder you could find because felony murder would require that the killing take place during the course of a robberyWell, yes, I will have to back up.
"You could consider felony murder if youwith regard to one of these counts, either two, three or fourif you harbored a reasonable doubt that the defendant, in his own brain, intended the death of any person; suppose you doubt that and you find that doubt to be reasonable, that he intended the death of any person, but, nonetheless, you are convinced beyond a reasonable doubt that he did intend the robbery in his own brain and that he, either in person or through an accomplice acting in complicity with him, committed the acts necessary for the robbery and that, although he did not intend the death in his own head, he either in person or through an accomplice did shoot to death Steve Dyas. Then that would be non-capital murder under the felony murder doctrine, which says even though he doesn't intend that someone die, if someone be killed in the course of a robbery in any degree, then the killer is guilty of non-capital murder and the same analysis would go for the other two counts, count two and count three. Does that make sense? You understand? (Jurors nodding in the affirmative.)"
(R. 1512-13.) Taylor complains that the trial court's use of the words "if," "could," and "nonetheless," within the reinstruction was a signal from the trial court to the jury that consideration of felony murder was a "longshot" and should not be seriously considered.
The reinstruction on felony murder was a complete and correct instruction on felony murder, and, when combined with the trial court's original instructions on lesserincluded offenses, it gave the jury the necessary information to consider felony murder as a lesser included offense for counts two, three, and four of the indictment. Kennedy v. State, supra. There is no plain error.
Taylor also complains that the trial court erred in not applying felony murder to count one, the intentional murder of two or more persons by one act or pursuant to one scheme or course of conduct. We find that, because there was not an underlying felony as an element of count one, felony murder was not a lesser-included offense of count one and the trial court correctly instructed the jury. See Ex parte Bates, 461 So.2d 5 (Ala.1984); § 13A-1-9(b), Ala. Code 1975.

E.
Taylor next argues that the following portion of the trial court's instruction on the element of intent was error:
"Likewise, intent to kill may be inferred from the nature of the wound inflicted and the facts and circumstances surrounding the infliction of the wound, if you find a wound to have been inflicted at all."
(R. 1480.) Taylor argues, for the first time on appeal, that this instruction, without specifying that the jury must first conclude that Taylor inflicted the wounds, *1209 invited the jury to impermissibly transfer McMillan's intent to Taylor.
A review of the trial court's complete instructions reveals that the trial court thoroughly instructed the jury that, in order to convict Taylor for an intentional murder, it had to find that Taylor had, "in his own brain," the particularized intent to kill. The trial court's complete instruction was correct and did not mislead the jury. There is no plain error here. King v. State, 595 So.2d 539 (Ala.Cr.App.1991).

F.
Taylor next argues that the trial court's following instruction on the defense of alibi was improper:
"An alibi or the alibi defense is that a defendant was somewhere else other than the scene of a crime at the time of the crime. When I speak of the alibi defense, I do not mean to suggest that the defendant has to prove anything, but rather, if the issue be injected, then the State must disprove it.
"One or more witnesses did offer evidence in this case that, at the time of the alleged offenses, the defendant was somewhere else besides the scene of the alleged offenses. You ladies and gentlemen may consider the evidence so offered in determining whether you are convinced beyond a reasonable doubt or not convinced beyond a reasonable doubt of the defendant's guilt.
"That is to say, if you find that you can reasonably conclude that the defendant was somewhere else at the time of the alleged crime other than the scene of the alleged crime, that would be a reasonable doubt, which would entitle the defendant to an acquittal. If, however, the evidence is not such that you can reasonably conclude that the defendant was elsewhere than the scene of the crime at the time of the crime, then the defendant would not be entitled to an acquittal on the theory of alibi.
"I will say once again, the burden is on the state to prove the case beyond a reasonable doubt. The defendant has no burden."
(R. 1484-85.) Taylor argues, for the first time on appeal, that the use of the words, "if ... the evidence is not such that you can reasonably conclude ..." impermissibly shifted the burden of proof to Taylor to produce "reasonable" evidence of his innocence. This interpretation completely ignores the beginning and closing portions of the instruction, which repeatedly instructs the jury as to the proper burden of proof. Taylor's interpretation is, at best, strained. The trial court's instruction on the defense of alibi did not shift the burden of proof. This argument is without merit. Harris v. State, 394 So.2d 96, 100 (Ala.Cr.App.1981).

G.
At the beginning of the trial court's instructions on lesser-included offenses to capital murder, the trial court said:
"I will say at the outset of this aspect of the charge, the state is entitled to have you return a conviction for the highest or most serious degree of crime of which you are convinced beyond a reasonable doubt."
(R. 1475.) For the first time on appeal, Taylor charges that, with this instruction, the trial court impermissibly instructed the jury that the state was "entitled" to a conviction. This interpretation of the instruction is incorrect. Addington v. State, supra.

H.
Taylor next accuses the trial court of impermissibly summarizing the State's theory of the case under each of the counts, thereby destroying the presumption of judicial impartiality and leading *1210 the jury to believe that it should convict Taylor.
What Taylor refers this court to as evidence of this allegation of error is the trial court's summary of the four counts of the indictment at the beginning of the court's guilt-phase instructions to the jury. This portion of the instruction begins with the statement: "The indictment in this case charges the defendant with capital murder. We have four counts and I will explain them in greater detail to you." (R. 1456.) The instruction on the indictment ends with:
"The indictment in this case, as I think I have mentioned to you before, but I will emphasize now, is not evidence against the defendant. The indictment is merely the formal method under our constitution by which a defendant is accused of a crime and placed on trial. But the indictment provides no proof nor presumption nor inference that the defendant is guilty of any offense charged in the indictment."
(R. 1458.) From that instruction, the trial court then proceeded to instruct the jury on the State's burden of proof.
Taylor's argument, raised for the first time on appeal, that the trial court's summary of the indictment removed the court from its impartial role, or was interpreted by the jury as the court's adoption of the charges brought by the State is a strained and incorrect interpretation of the instruction. The trial court's instruction was not error, plain or otherwise. Maples v. State, 758 So.2d at 61 (Ala.Cr.App.1999).

I.
Taylor next argues, for the first time on appeal, that the trial court impermissibly implied that the instructions it was giving to the jury were not individualized, but the same instructions that are given in every case, thus, according to Taylor, minimizing the jury's sense of responsibility. The instruction from which Taylor draws his argument is as follows:
"Now, ladies and gentlemen, I am going to be giving you about 45 minutes of instructions, maybe a little bit longer. But I don't want ... the length of these instructions to be taken as any sort of suggestion as to any strength or weakness in the case. America is a great country in that parties are entitled to the same instructions in a case of this kind, regardless of whether the case is no case, a strong case, a weak case, an average case, or whatever kind of case. Every defendant and every prosecutor gets this set of instructions. My giving this set of instructions is simply testament to the rule of law in this country and in no respect is intended to reflect on strength or weakness or any other jury question with regard to the facts in this case."
(R. 1454-55.) Taylor's argument is based on that part of the third sentence of the instruction starting with the word "parties." However, we will not review this instruction for error based on a single phrase within a single sentence, but, instead, will review the instruction as a whole and in the context of the remaining instructions. Kennedy v. State, 472 So.2d at 1103. In doing so, we find Taylor's argument to be a strained interpretation of a sensible and proper instruction. There is nothing in the instruction that would reasonably lead the jury to shirk or minimize its responsibility, or that even hints that the trial court did not individualize its instructions to the case before it. There is no error in this instruction, plain or otherwise.

SENTENCING-PHASE INSTRUCTIONS.

A.
Taylor argues that the trial court failed to advise the jury that it needed to *1211 unanimously find the existence of an aggravating circumstance beyond a reasonable doubt. Because this issue is raised for the first time on appeal, we review for plain error only. Rule 45A, Ala.R.App.P.
A review of the trial court's sentencing instructions indicates that the trial court repeatedly instructed the jury that it must be convinced beyond a reasonable doubt, based on the evidence, that one or more aggravating circumstances exists, before it could consider the death penalty. (R. 1582-98.) On page 1584 of the record, the trial court states, "Now, as I stated to you before, the burden of proof is on the state to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance ..."
Based on our review of the record, we find that any possible error that may have occurred from the trial court's failure to use the word "unanimous" did not amount to plain error. The court's use of the terms "the jury" and "each of you" implies that any findings of aggravating circumstances had to be unanimous. "We must evaluate instructions like a reasonable juror may have interpreted them." Stewart v. State, 601 So.2d 491, 507 (Ala. Cr.App.), opinion after remand, 659 So.2d 120 (Ala.Cr.App.1992), aff'd in part, rev'd in part on other grounds, 659 So.2d 122 (Ala.1993).
Regardless of whether the instruction was sufficient, any error in this instruction would be harmless because the jury recommended that Taylor be sentenced to life imprisonment without parole. Sockwell v. State, 675 So.2d 4, 36 (Ala.Cr. App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).

B.
Taylor next argues that the trial court failed to instruct the jury that each juror could consider the existence of mitigating circumstances independently of the other jurors. We have reviewed the trial court's instructions and conclude that the charge was not contrary to the principles set out in Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). See Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995), aff'd, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
As above, any error in this instruction and its effect on the jury would be harmless, because the jury recommended a sentence of life imprisonment without parole. Sockwell v. State, supra.

XXXIV.
Taylor argues that the trial court erred when it "refused to give numerous legally correct and necessary jury instructions that were proposed by the defense." Taylor makes a general argument that all of his proposed instructions were correct statements of the law and that the trial court's decision not to give some of those instructions was, therefore, reversible error. He does little but refer us to page numbers in the record; he does not discuss individual proposed instructions, nor does he apply the law to those proposed instructions. As we stated before, we consider such reliance an indication of a lack of merit of the contention Taylor now makes. Hardy v. State, supra. However, Taylor does refer us to several individual proposed instructions as examples of the court's error. We will discuss those instructions individually.
As we noted above in our discussion of the court's instructions:

*1212 "A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).
Ward v. State, 610 So.2d 1190, 1194 (Ala. Cr.App.1992).

GUILT-PHASE PROPOSED INSTRUCTIONS.
Taylor directs the court to proposed defense instructions 2, 3, 4, and 5, on burden of proof, presumption of innocence, and the definition of reasonable doubt. We note that, when the trial court began its hearing on the proposed defense instructions, it stated:
"On the one hand, this is a good set of jury instructions that the defense has prepared in many respects, but a lot of them duplicate or say in different ways what I generally say in my standard charge and thatfor the most part those statements in this set that you have submitted that are correct statements of the law will be included in my standard charge. There will be a few of these that I give, but just a few over and above my standard charge. But I will go through these one by one and tell you."
(R. 1346.) A review of proposed defense instructions 2, 3, 4, and 5 and the trial court's instructions given at the guilt phase indicates that the proposed instructions were fully covered by the trial court's instructions to the jury. In fact, a review of all of the proposed defense instructions for the guilt phase of trial that were not given by the trial court indicates that the trial court's jury charge adequately addressed the law and concepts proposed in each of those instructions. Thus, the trial court was correct in refusing to give the instructions proposed by the defense. "Where the import and intent of a defendant's requested charge are covered in the oral instructions of the trial judge, the refusal of the requested charge does not constitute reversible error, even though the oral charge is not in the actual language of the request." White v. State, 410 So.2d 135, 136 (Ala.Cr.App.1981).

SENTENCING-PHASE PROPOSED INSTRUCTIONS.
Our review of the trial court's decision on whether to give the proposed sentencing-phase instructions indicates that the court either adequately covered the proposed instructions in its sentencing-phase jury charge, or that the proposed instructions were misleading, incomplete, or incorrect statements of the law. The trial court did not err in denying proposed defense instructions 1, 2, 4, 5, 7, and 8, or any other proposed instruction not given by the court. White v. State, supra.
Regardless or whether the trial court may have erred in not giving a proposed defense instruction, any error would have been harmless because Taylor's jury recommended that he be sentenced to life imprisonment without parole. Burgess v. State, 723 So.2d 742, 768 (Ala.Cr.App. 1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).

XXXV.
Taylor argues that, while he was convicted of killing three people, he was impermissibly sentenced to death four *1213 timesthe trial court imposed the death penalty for each of the four counts of capital murder for which Taylor was convicted. Taylor argues that imposing the death penalty four times for three murders violates the Double Jeopardy Clause of the Fifth Amendment and constitutes cruel and unusual punishment. Because Taylor raises this issue for the first time on appeal, we review it for plain error only. Rule 45A, Ala.R.App.P.
The imposition of the death penalty in cases where a defendant has been convicted of multiple counts of capital murder that are greater than the number of victims actually murdered, has been repeatedly upheld by this court. Quoting the Alabama Supreme Court in Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), this court has previously stated:
"`In Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court addressed the scope of the coverage of the Double Jeopardy Clause, as follows:
"`"The Double Jeopardy Clause embodies three protections: `It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' North Carolina v. Pierce [Pearce], 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The Blockburger [v. United States 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d [L.Ed.] 306 (1932),] test was developed `in the context of multiple punishments imposed in a single prosecution.' Garrett v. United States, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985)."
"`Grady, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561. This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in the three areas enumerated above. Ex parte Wright, 477 So.2d 492 (Ala.1985).
"`In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction. That is, he was not prosecuted twice for the same offense. Moreover, while in King [v. State, 574 So.2d 921 (Ala.Cr.App. 1990) ] the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.
"`In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).'"
Arthur v. State, 711 So.2d 1031, 1075 (Ala. Cr.App.1996), aff'd, 711 So.2d 1097 (Ala. 1997).
In the present case, as in Arthur, and McWilliams, it is clear that the jury knew that it was convicting Taylor of murdering Bruce Gaston, Sherry Gaston, and Steve Dyas only once. It was also clear that the jury and the trial court knew that Taylor's crimes were made capital because his three victims were each murdered in the course of a robbery and because the three victims were murdered pursuant to a common plan or scheme. While the trial judge imposed the death penalty in each capital murder count for which Taylor had been convicted, the death penalties imposed for each count are, in effect, a single sentence because, in reality, Taylor can only be put *1214 to death once. We therefore conclude that the trial court has not prescribed a greater punishment than the legislature intended. Arthur v. State, supra. There is no unfair prejudice suffered by Taylor in the trial court's imposition of the death penalty for the four counts of capital murder. There is no plain error.

XXXVI.
Taylor argues that the cumulative effect of all of the above claims of error denied him a fair trial. We have reviewed each allegation of error as well as the cumulative effect of those alleged errors and find that the cumulative effect of these alleged errors does not warrant a reversal. Moreover, the claimed errors to which Taylor refers have now been determined to be without merit. Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App. 1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

XXXVII.
In reviewing the sentence of death, as we are required to do by § 13A-5-53, Ala.Code 1975, we make the following findings: We have searched the record and have found no error in the sentencing proceedings adversely affecting Taylor's rights. Pursuant to Rule 45A, Ala.R.App. P., we have searched the entire proceedings under review and found no plain error or defect that has, or probably has, adversely affected any substantial right of Taylor's.
In count 1, the murder of two or more persons by one act or pursuant to one scheme or course of conduct, the trial court found the existence of one aggravating circumstance: that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(8). In finding this aggravating circumstance, the trial court noted:
"The evidence proves that none of the victims offered any resistance whatsoever; two of them pleaded for their lives and offered Taylor and McMillan all of the victims' money and property available. And yet Taylor and McMillan deliberately and methodically murdered all three victims in the most certain way conceivable."
(C. 158.)
In counts 2, 3, and 4, the murder of Sherry Gaston, Bruce Gaston, and Steve Dyas during a robbery in the first degree or an attempt thereof committed by the defendant, the trial court found the existence of one aggravating circumstance: that the capital offenses were committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, of flight after committing, or attempting to commit a robbery. § 13A-5-49(4). In finding this aggravating circumstance, the trial court noted:
"The evidence at trial proves beyond a reasonable doubt that the performance of the robbery scheme began before all three murders and continued during and after all three murders, and that Taylor and McMillan consummated the robberies of the victims' money and belongings and the Ford Mustang immediately after the murders and committed the murders to exert unauthorized control over the property and to overcome the victims' physical power of resistance to the taking of the property."
(C. 158.)
The trial court found the existence of one statutory mitigating circumstance: that Taylor did not have a significant history of prior criminal activity, § 13A-5-51(1). *1215 The trial court considered the following nonstatutory mitigating circumstances offered by Taylor: The fact that accomplice Kenyatta McMillan received a more lenient sentence of life imprisonment without parole as part of a plea bargain agreement in return for his testimony against Taylor; Taylor's past attendance and activities with his family's church; the evidence that Taylor is loved by his family; Taylor's testimony that he loves his family members; and the jury's "lingering doubt." § 13A-5-52, Ala.Code 1975. (C. 158-63.)
It is the conclusion of this Court that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record.
As required by § 13A-5-53(b)(3), we must determine whether Taylor's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. After our review of the evidence of these execution-style murders, we adopt the trial court's accurate synopsis of this despicable act: Taylor specifically, deliberately, methodically, and heartlessly formed the specific and particularized intent to kill Sherry Gaston, Bruce Gaston, and Steve Dyas, and then executed that intent equally deliberately, methodically, and heartlessly. We note that at the time of this trial, two-thirds of Alabama death sentences were imposed upon convictions for robbery-murder. Kuenzel v. State, 577 So.2d 474, 530 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Stephens v. State, 580 So.2d 11, 26 (Ala.Cr. App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
It is the determination of this court that death is the proper sentence in this case. There is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
The judgment of the circuit court is affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, BASCHAB, and FRY, JJ., concur.
NOTES
[1] According to the pathologist, the first gunshot wound was fatal.
[2] Throughout this questioning and argument, all parties used the term, "projectory." From the context in which it was used, we assume the parties intended to use the word "trajectory."
[3] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[4] United States v. Garcia, 530 F.2d 650 (5th Cir.1976); Dawson v. Cowan, 531 F.2d 1374 (6th Cir.1976); United States v. Diaz, 585 F.2d 116 (5th Cir.1978); United States v. DeGeratto, 876 F.2d 576 (7th Cir.1989).
[5] Because the record is silent, we cannot know for sure what the trial judge meant by this comment. We can presume from the routine practice of many of the circuits in Alabama that, when the entire venire for the term of court was first empaneled, another judge met with the them to hear reasons offered by some veniremembers in order to be excused from jury duty.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] In Gray, the Court found a codefendant's confession had been improperly admitted into evidence where the police witness who was reading the admission to the jury substituted the word "deleted" for the defendant's name every time he was mentioned. Then at the end of the reading, the officer responded affirmatively when the prosecutor asked him whether, as a result of the admission, he was able to arrest the defendant.
[8] "As a general rule, ... character evidence is not admissible when offered to prove that a person is of a particularly good or bad character and that the person acted in conformity with that character on the occasion that is the basis of the litigation.... Evidence of collateral conduct generally is inadmissible when offered to prove that the person committing the conduct is of a certain character and, consequently, acted in keeping with that character on the occasion of the act now at issue in the litigation." Advisory Committee's Notes, Rule 404, Ala.R.Evid.
[9] Taken in context, this portion of the prosecutor's argument reflected the State's position that there was no evidence to support the defense position that Taylor had $13,700 with which he could have bought the automobile from Steve Dyas Motors.
[10] Timothy McVeigh was convicted and sentenced to death for the April 19, 1995, massive explosion at the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, which killed 168 persons, including 15 children attending a daycare center located in the building and 4 more children who were visiting the building. The explosion was caused by a XXXX-XXXX pound bomb created by McVeigh, which he placed in a rental truck and then parked near the building. The explosion was felt and heard six miles away and tore a gaping hole into the front of the Murrah Building. United States v. McVeigh, 153 F.3d 1166 (10th Cir.1998), cert. denied, 526 U.S. 1007, 119 S.Ct. 1148, 143 L.Ed.2d 215 (1999).
[11] It should be noted that the Alabama Legislature recently passed the "Investment in Justice Act of 1999," and, among other things, that Act amended § 15-12-21. Under the new act, the rate of compensation for attorneys representing indigent criminal defendants is increased to $50 per hour for in-court time and $30 per hour for out-of-court time, with no limit on compensation for an attorney in a case involving a capital offense. Moreover, effective October 1, 2000, the hourly rate increases to $40 per hour for out-of-court time and $60 per hour for in-court time.